Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ADVOCATE HEALTH CARE NETWORK ET AL. *v.* STAPLETON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 16–74. Argued March 27, 2017—Decided June 5, 2017*

The Employee Retirement Income Security Act of 1974 (ERISA) generally obligates private employers offering pension plans to adhere to an array of rules designed to ensure plan solvency and protect plan participants. "[C]hurch plan[s]," however, are exempt from those regulations. 29 U. S. C. §1003(b)(2). From the beginning, ERISA has defined a "church plan" as "a plan established and maintained . . . for its employees . . . by a church." §1002(33)(A). Congress then amended the statute to expand that definition, adding the provision whose effect is at issue here: "A plan established and maintained for its employees . . . by a church . . . includes a plan maintained by an organization . . . the principal purpose . . . of which is the administration or funding of [such] plan . . . for the employees of a church . . . , if such organization is controlled by or associated with a church." §1002(33)(C)(i). (This opinion refers to the organizations described in that provision as "principal-purpose organizations.")

Petitioners, who identify themselves as three church-affiliated nonprofits that run hospitals and other healthcare facilities (collectively, hospitals), offer their employees defined-benefit pension plans. Those plans were established by the hospitals themselves, and are managed by internal employee-benefits committees. Respondents, current and former hospital employees, filed class actions alleging that the hospitals' pension plans do not fall within ERISA's church-

_____

*Together with No. 16–86, *Saint Peter's Healthcare System et al.* v. *Kaplan,* on certiorari to the United States Court of Appeals for the Third Circuit, and No. 16–258, *Dignity Health et al.* v. *Rollins*, on certiorari to the United States Court of Appeals for the Ninth Circuit.

2        ADVOCATE HEALTH CARE NETWORK *v.* STAPLETON

Syllabus

plan exemption because they were not established by a church. The District Courts, agreeing with the employees, held that a plan must be established by a church to qualify as a church plan. The Courts of Appeals affirmed.

*Held*: A plan maintained by a principal-purpose organization qualifies as a "church plan," regardless of who established it. Pp. 5–15.

(a) The term "church plan" initially "mean[t]" only "a plan established and maintained . . . by a church." But subparagraph (C)(i) provides that the original definitional phrase will now "include" another—"a plan maintained by [a principal-purpose] organization." That use of the word "include" is not literal, but tells readers that a *different* type of plan should receive the same treatment (*i.e.,* an exemption) as the type described in the old definition. In other words, because Congress deemed the category of plans "established and maintained by a church" to "include" plans "maintained by" principal-purpose organizations, those plans—and *all* those plans—are exempt from ERISA's requirements.

Had Congress wanted, as the employees contend, to alter only the maintenance requirement, it could have provided in subparagraph (C)(i) that "a plan maintained by a church includes a plan maintained by" a principal-purpose organization—removing "established and" from the first part of the sentence. But Congress did not adopt that ready alternative. Instead, it added language whose most natural reading is to enable a plan "maintained" by a principal-purpose organization to substitute for a plan both "established" and "maintained" by a church. And as a corollary to that point, the employees' construction runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason. The employees read subparagraph (C)(i) as if it were missing the two words "established and." This Court, however, "give[s] effect, if possible, to every clause and word of a statute." *Williams* v. *Taylor*, 529 U. S. 362, 404. Pp. 5–12.

(b) Both parties' accounts of Congress's purpose in enacting subparagraph (C)(i) tend to confirm this Court's reading that plans maintained by principal-purpose organizations are eligible for the church-plan exemption, whatever their origins. According to the hospitals, Congress wanted to ensure that churches and church-affiliated organizations received comparable treatment under ERISA. If that is so, this Court's construction of the text fits Congress's objective to a T, as a church-establishment requirement would necessarily disfavor plans created by church affiliates. The employees, by contrast, claim that subparagraph (C)(i)'s main goal was to bring within the church-plan exemption plans managed by local pension boards—organizations often used by congregational denominations—so as to

Syllabus

ensure parity between congregational and hierarchical churches.  But that account cuts against, not in favor of, their position.  Keeping the church-establishment requirement would have prevented some plans run by pension boards—the very entities the employees say Congress most wanted to benefit—from qualifying as "church plans" under ERISA.  Pp. 12–14.

No. 16–74, 817 F. 3d 517; No. 16–86, 810 F. 3d 175; and No. 16–258, 830 F. 3d 900, reversed.

    KAGAN, J., delivered the opinion of the Court, in which all other Members joined, except GORSUCH, J., who took no part in the consideration or decision of the cases. SOTOMAYOR, J., filed a concurring opinion.

Cite as:  581 U. S. ____ (2017)              1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

Nos. 16–74, 16–86, and 16–258

—————

## ADVOCATE HEALTH CARE NETWORK, ET AL., PETITIONERS

16–74        *v.*

### MARIA STAPLETON, ET AL.;

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT


## SAINT PETER'S HEALTHCARE SYSTEM, ET AL., PETITIONERS

16–86        *v.*

### LAURENCE KAPLAN; AND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT


## DIGNITY HEALTH, ET AL., PETITIONERS

16–258        *v.*

### STARLA ROLLINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


[June 5, 2017]

JUSTICE KAGAN delivered the opinion of the Court.

The Employee Retirement Income Security Act of 1974 (ERISA) exempts "church plan[s]" from its otherwise-

Opinion of the Court

comprehensive regulation of employee benefit plans.  88
Stat. 840, as amended, 29 U. S. C. §1003(b)(2).  Under the
statute, certain plans for the employees of churches or
church-affiliated nonprofits count as "church plans" even
though not actually administered by a church.  See
§1002(33)(C)(i).  The question presented here is whether
a church must have originally *established* such a plan for
it to so qualify.  ERISA, we hold, does not impose that
requirement.

## I

Petitioners identify themselves as three church-
affiliated nonprofits that run hospitals and other
healthcare facilities (collectively, hospitals).[1]  They offer
defined-benefit pension plans to their employees.  Those
plans were established by the hospitals themselves—not
by a church—and are managed by internal employee-
benefits committees.

ERISA generally obligates private employers offering
pension plans to adhere to an array of rules designed to
ensure plan solvency and protect plan participants.  See
generally *New York State Conference of Blue Cross & Blue
Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 651
(1995) (cataloguing ERISA's "reporting and disclosure
mandates," "participation and vesting requirements," and

---

[1] The parties disputed the hospitals' church ties in the courts below,
see n. 2, *infra*, but we assume for purposes of this decision that the
facts are as the hospitals describe them.  On those facts: Advocate
Health Care Network operates 12 hospitals and some 250 other
healthcare facilities in Illinois, and is associated with the Evangelical
Lutheran Church in America and the United Church of Christ.  Saint
Peter's Healthcare System runs a teaching hospital and several other
medical facilities in New Jersey, and is both owned and controlled by a
Roman Catholic diocese there.  And Dignity Health runs an extensive
network of community hospitals throughout the country, and maintains
ties to the Catholic religious orders that initially sponsored some of its
facilities.

"funding standards"). But in enacting the statute, Congress made an important exception. "[C]hurch plan[s]" have never had to comply with ERISA's requirements. §1003(b)(2).

The statutory definition of "church plan" came in two distinct phases. From the beginning, ERISA provided that "[t]he term 'church plan' means a plan established and maintained . . . for its employees . . . by a church or by a convention or association of churches." §1002(33)(A). Then, in 1980, Congress amended the statute to expand that definition by deeming additional plans to fall within it. The amendment specified that for purposes of the church-plan definition, an "employee of a church" would include an employee of a church-affiliated organization (like the hospitals here). §1002(33)(C)(ii)(II). And it added the provision whose effect is at issue in these cases:

> "A plan established and maintained for its employees . . . by a church or by a convention or association of churches includes a plan maintained by an organization . . . the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches." §1002(33)(C)(i).

That is a mouthful, for lawyers and non-lawyers alike; to digest it more easily, note that everything after the word "organization" in the third line is just a (long-winded) description of a particular kind of church-associated entity—which this opinion will call a "principal-purpose organization." The main job of such an entity, as the statute explains, is to fund or manage a benefit plan for the employees of churches or (per the 1980 amendment's other

Opinion of the Court

part) of church affiliates.

The three federal agencies responsible for administering ERISA have long read those provisions, when taken together, to exempt plans like the hospitals' from the statute's mandates. (The relevant agencies are the Internal Revenue Service, Department of Labor, and Pension Benefit Guaranty Corporation.) The original definitional provision—§1002(33)(A), or paragraph (A) for short—defines a "church plan" as one "established and maintained . . . by a church"—not by a church-affiliated nonprofit. But according to the agencies, the later (block-quoted) provision—§1002(33)(C)(i), or just subparagraph (C)(i)—expands that definition to include any plan maintained by a principal-purpose organization, regardless of whether a church initially established the plan. And, the agencies believe, the internal benefits committee of a church-affiliated nonprofit counts as such an organization. See, *e.g.,* IRS General Counsel Memorandum No. 39007 (Nov. 2, 1982), App. 636–637. That interpretation has appeared in hundreds of private letter rulings and opinion letters issued since 1982, including several provided to the hospitals here. See App. 57–69, 379–386, 668–715.

The three cases before us are part of a recent wave of litigation challenging the agencies' view. Respondents, current and former employees of the hospitals, filed class actions alleging that their employers' pension plans do not fall within ERISA's church-plan exemption (and thus must satisfy the statute's requirements). That is so, the employees claim, because those plans were not established by a church—and ERISA, even as amended, demands that all "church plans" have such an origin. According to the employees, the addition of subparagraph (C)(i) allowed principal-purpose organizations to *maintain* such plans in lieu of churches; but that provision kept as-is paragraph (A)'s insistence that churches themselves *establish* "church plans." See *id.,* at 265–268, 435–437, 783–785. The Dis-

Opinion of the Court

trict Courts handling the cases agreed with the employees' position, and therefore held that the hospitals' plans must comply with ERISA.[2]

The Courts of Appeals for the Third, Seventh, and Ninth Circuits affirmed those decisions. The Third Circuit ruled first, concluding that ERISA's "plain text" requires that a pension plan be established by a church to qualify for the church-plan exemption. *Kaplan* v. *Saint Peter's Healthcare System*, 810 F. 3d 175, 177 (2015). In the court's view, paragraph (A) set out "two requirements" for the exemption—"establishment and maintenance"—and "only the latter is expanded by the use of 'includes'" in subparagraph (C)(i). *Id.*, at 181. The Seventh and Ninth Circuits relied on similar reasoning to decide in the employees' favor. See *Stapleton* v. *Advocate Health Care Network*, 817 F. 3d 517, 523 (CA7 2016); *Rollins* v. *Dignity Health*, 830 F. 3d 900, 906 (CA9 2016).

In light of the importance of the issue, this Court granted certiorari. 579 U. S. ___ (2016).

## II

The dispute in these cases about what counts as a "church plan" hinges on the combined meaning of paragraph (A) and subparagraph (C)(i). Interpretive purists may refer back as needed to the provisions as quoted above. See *supra,* at 3. But for those who prefer their statutes in (comparatively) user-friendly form, those provisions go as follows:

   Under paragraph (A), a "'church plan' means a plan

_____

[2]The employees alternatively argued in the District Courts that the hospitals' pension plans are not "church plans" because the hospitals do not have the needed association with a church and because, even if they do, their internal benefits committees do not count as principal-purpose organizations. See App. 267–269, 437–438, 785–786. Those issues are not before us, and nothing we say in this opinion expresses a view of how they should be resolved.

Opinion of the Court

established and maintained . . . by a church."

Under subparagraph (C)(i), "[a] plan established and maintained . . . by a church . . . includes a plan maintained by [a principal-purpose] organization."[3]

The parties agree that under those provisions, a "church plan" need not be maintained by a church; it may instead be maintained by a principal-purpose organization. But the parties differ as to whether a plan maintained by that kind of organization must still have been established by a church to qualify for the church-plan exemption. The hospitals say no: The effect of subparagraph (C)(i) was to bring within the church-plan definition all pension plans maintained by a principal-purpose organization, regardless of who first established them. The employees say yes: Subparagraph (C)(i) altered only the requirement that a pension plan be maintained by a church, while leaving intact the church-establishment condition. We conclude that the hospitals have the better of the argument.

Start, as we always do, with the statutory language—here, a new definitional phrase piggy-backing on the one already existing. The term "church plan," as just stated, initially "mean[t]" only "a plan established and maintained . . . by a church." But subparagraph (C)(i) provides that the original definitional phrase will now "include" another—"a plan maintained by [a principal-purpose] organization." That use of the word "include" is not literal—any more than when Congress says something like "a State 'includes' Puerto Rico and the District of Colum-

---

[3]Again, we use the term "principal-purpose organization" as shorthand for the entity described in subparagraph (C)(i): a church-associated organization whose chief purpose or function is to fund or administer a benefits plan for the employees of either a church or a church-affiliated nonprofit. See *supra,* at 3. And again, the scope of that term—and whether it comprehends the hospitals' internal benefits committees—is not at issue here. See n. 2, *supra.*

Opinion of the Court

bia." See, *e.g.,* 29 U. S. C. §1002(10).[4]   Rather, it tells readers that a *different* type of plan should receive the same treatment (*i.e.,* an exemption) as the type described in the old definition.  And those newly favored plans, once again, are simply those "maintained by a principal-purpose organization"—irrespective of their origins.   In effect, Congress provided that the new phrase can stand in for the old one as follows: "The term 'church plan' means ~~a plan established and maintained by a church~~ [a plan maintained by a principal-purpose organization]."   The church-establishment condition thus drops out of the picture.

Consider the same point in the form of a simple logic problem, with paragraph (A) and subparagraph (C)(i) as its first two steps:

> Premise 1: A plan established and maintained by a church is an exempt church plan.

> Premise 2: A plan established and maintained by a church includes a plan maintained by a principal-purpose organization.

> Deduction: A plan maintained by a principal-purpose organization is an exempt church plan.

Or, as one court put the point without any of the ERISA terminology: "[I]f A is exempt, and A includes C, then C is exempt."  *Overall* v. *Ascension*, 23 F. Supp. 3d 816, 828 (ED Mich. 2014).  Just so.  Because Congress deemed the category of plans "established and maintained by a church" to "include" plans "maintained by" principal-purpose organizations, those plans—and *all* those plans— are exempt from ERISA's requirements.

------

[4] Or any more than when Congress, in the same 1980 amendment to ERISA, provided that an "employee of a church" was to "include[]" an employee of a church-affiliated organization.   §1002(33)(C)(ii); see *supra,* at 3.

Had Congress wanted, as the employees contend, to alter only the maintenance requirement, it had an easy way to do so—differing by only two words from the language it chose, but with an altogether different meaning. Suppose Congress had provided that "a plan maintained by a church includes a plan maintained by" a principal-purpose organization, leaving out the words "established and" from the first part of the sentence. That amendment would have accomplished exactly what the employees argue Congress intended: The language, that is, would have enabled a principal-purpose organization to take on the maintenance of a "church plan," but left untouched the requirement that a church establish the plan in the first place. But Congress did not adopt that ready alternative. Instead, it added language whose most natural reading is to enable a plan "maintained" by a principal-purpose organization to substitute for a plan both "established" and "maintained" by a church. That drafting decision indicates that Congress did not in fact want what the employees claim. See, *e.g., Lozano* v. *Montoya Alvarez*, 572 U. S. 1, ___–___ (2014) (slip op., at 13–14) (When legislators did not adopt "obvious alternative" language, "the natural implication is that they did not intend" the alternative).

A corollary to this point is that the employees' construction runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason. See generally A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012). As just explained, the employees urge us to read subparagraph (C)(i) as if it were missing the two words "established and." The employees themselves do not contest that point: They offer no account of what function that language would serve on their proposed interpretation. See Brief for Respondents 34–35. In essence, the employees ask us to treat those words as stray marks on a page—

notations that Congress regrettably made but did not really intend. Our practice, however, is to "give effect, if possible, to every clause and word of a statute." *Williams* v. *Taylor*, 529 U. S. 362, 404 (2000) (internal quotation marks omitted). And here, that means construing the words "established and" in subparagraph (C)(i) as removing, for plans run by principal-purpose organizations, paragraph (A)'s church-establishment condition.

The employees' primary argument to the contrary takes the form of a supposed interpretive principle: "[I]f a definition or rule has two criteria, and a further provision expressly modifies only one of them, that provision is understood to affect only the criterion it expands or modifies." Brief for Respondents 22. Applied here, the employees explain, that principle requires us to read subparagraph (C)(i) as "modify[ing] only the criterion" in paragraph (A) that "it expressly expands ('maintained'), while leaving the other criterion ('established') unchanged." *Id.,* at 14. The employees cite no precedent or other authority to back up their proposed rule of construction, but they offer a thought-provoking hypothetical to demonstrate its good sense. *Id.,* at 22. Imagine, they say, that a statute provides free insurance to a "person who is disabled and a veteran," and an amendment then states that "a person who is disabled and a veteran includes a person who served in the National Guard." *Ibid.* (quoting 810 F. 3d, at 181). Would a non-disabled member of the National Guard be entitled to the insurance benefit? Surely not, the employees answer: All of us would understand the "includes" provision to expand (or clarify) only the meaning of "veteran"—leaving unchanged the requirement of a disability. And the same goes here, the employees claim.

But one good example does not a general rule make. Consider a variant of the employees' hypothetical: A statute offers free insurance to a "person who enlisted and served in the active Armed Forces," with a later amend-

ment providing that "a person who enlisted and served in the active Armed Forces includes a person who served in the National Guard."  Would a person who served in the National Guard be ineligible for benefits unless she had also enlisted in the active Armed Forces—say, the regular Army or Navy?  Of course not.[5]  Two hypotheticals with similar grammatical constructions, two different results. In the employees' example, the mind rebels against reading the statute literally, in line with the logical and canonical principles described above.  In the variant, by contrast, the statute's literal meaning and its most natural meaning cohere: Satisfaction of the amendment's single eligibility criterion—service in the National Guard—is indeed enough.  What might account for that divergence? And what does such an explanation suggest for ERISA?

Two features of the employees' hypothetical, when taken in combination, make it effective.  First, the criteria there—veteran-status and disability—are relatively distinct from one another.  (Compare enlistment and service, which address similar matters and tend to travel in tan-

———————

[5]You might ask yourself, on reading this hypothetical statute, why Congress would not have made the removal of both original conditions clearer still by stating that the original provision "includes a person who *enlisted and* served in the National Guard."  We won't go down the rabbit hole of further expounding on a fictional statute, but we can answer a parallel question for subparagraph (C)(i).  Suppose Congress had stated that "[a] plan established and maintained . . . by a church . . . includes a plan *established and* maintained by [a principal-purpose] organization."  That language would have left out of the "church plan" definition pension plans originally established by churches, but subsequently maintained by principal-purpose organizations.  And everyone agrees—the employees no less than the hospitals—that Congress wanted to treat those plans as "church plans."  (The dispute is only as to plans that principal-purpose organizations both establish and maintain.)  See *supra,* at 6; Brief for Petitioners 25–26; Brief for Respondents 14, 35; Brief for United States as *Amicus Curiae* 24.  So Congress could not have taken such a drafting tack to eliminate the necessity of church establishment.

Opinion of the Court

dem, the one preceding the other.)  The more independent
the specified variables, the more likely that they were
designed to have standalone relevance.  Second and yet
more crucial, the employees' example trades on our back-
ground understanding that a given interpretation is simply
implausible—that it could not possibly have been what
Congress wanted.  Congress, we feel sure, would not have
intended *all* National Guardsmen to get a benefit that is
otherwise reserved for disabled veterans.  (Compare that
to our sense of whether Congress would have meant to
hinge benefits to Guardsmen on their enlistment in a
different service.)  That sense of inconceivability does most
of the work in the employees' example, urging readers to
discard usual rules of interpreting text because they will
lead to a "must be wrong" outcome.

But subparagraph (C)(i) possesses neither of those
characteristics.  For starters, the criteria at issue—
establishment and maintenance—are not unrelated.  The
former serves as a necessary precondition of the latter,
and both describe an aspect of an entity's involvement
with a benefit plan.  Indeed, for various purposes, ERISA
treats the terms "establish" and "maintain" interchange-
ably.  See, *e.g.,* §1002(16)(B) (defining the "sponsor" of a
plan as the organization that "establishe[s] or maintain[s]"
the plan).  So an amendment altering the one requirement
could naturally alter the other too.  What's more, nothing
we know about the way ERISA is designed to operate
makes that an utterly untenable result.  Whereas the
disability condition is central to the statutory scheme in
the employees' hypothetical, the church-establishment
condition, taken on its own, has limited functional signifi-
cance.  Establishment of a plan, after all, is a one-time,
historical event; it is the entity *maintaining* the plan that
has the primary ongoing responsibility (and potential
liability) to plan participants.  See Brief for United States
as *Amicus Curiae* 31; *Rose* v. *Long Island R. R. Pension*

*Plan*, 828 F. 2d 910, 920 (CA2 1987), cert. denied, 485 U. S. 936 (1988) ("[T]he status of the entity which currently maintains a particular pension plan bears more relation to Congress' goals in enacting ERISA and its various exemptions[] than does the status of the entity which established the plan"). So removing the establishment condition for plans run by principal-purpose organizations has none of the contextual implausibility—the "Congress could not possibly have meant that" quality—on which the employees' example principally rides.

To the contrary, everything we can tell from extra-statutory sources about Congress's purpose in enacting subparagraph (C)(i) supports our reading of its text. We say "everything we can tell" because in fact we cannot tell all that much. The legislative materials in these cases consist almost wholly of excerpts from committee hearings and scattered floor statements by individual lawmakers—the sort of stuff we have called "among the least illuminating forms of legislative history." *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (slip op., at 16). And even those lowly sources speak at best indirectly to the precise question here: None, that is, comments in so many words on whether subparagraph (C)(i) altered paragraph (A)'s church-establishment condition. Still, both the hospitals and the employees have constructed narratives from those bits and pieces about Congress's goals in amending paragraph (A). And our review of their accounts—the employees' nearly as much as the hospitals'—tends to confirm our conviction that plans maintained by principal-purpose organizations are eligible for ERISA's "church plan" exemption, whatever their origins.

According to the hospitals, Congress wanted to eliminate any distinction between churches and church-affiliated organizations under ERISA. See Brief for Petitioners 18, 33–35. The impetus behind the 1980 amendment, they claim, was an IRS decision holding that pen-

sion plans established by orders of Catholic Sisters (to benefit their hospitals' employees) did not qualify as "church plans" because the orders were not "carrying out [the Church's] religious functions." IRS General Counsel Memorandum No. 37266, 1977 WL 46200, *5 (Sept. 22, 1977). Many religious groups protested that ruling, criticizing the IRS for "attempting to define what is and what is not [a] 'church' and how the mission of the church is to be carried out." 125 Cong. Rec. 10054 (1979) (letter to Sen. Talmadge from the Lutheran Church–Missouri Synod); see *id.,* at 10054–10058 (similar letters). And that anger, the hospitals maintain, was what prompted ERISA's amendment: Congress, they say, designed the new provision to ensure that, however categorized, all groups associated with church activities would receive comparable treatment. See Brief for Petitioners 35.

If that is so, our construction of the text fits Congress's objective to a T. A church-establishment requirement necessarily puts the IRS in the business of deciding just what a church is and is not—for example (as in the IRS's ruling about the Sisters), whether a particular Catholic religious order should count as one. And that requirement, by definition, disfavors plans created by church affiliates, as compared to those established by (whatever the IRS has decided are) churches. It thus makes key to the "church plan" exemption the very line that, on the hospitals' account, Congress intended to erase.

The employees tell a different story about the origins of subparagraph (C)(i)—focusing on the pension boards that congregational denominations often used. See Brief for Respondents 14, 38–42; see also Brief for United States as *Amicus Curiae* 19–22. In line with their non-hierarchical nature, those denominations typically relied on separately incorporated local boards—rather than entities integrated into a national church structure—to administer benefits for their ministers and lay workers. According to the

employees, subparagraph (C)(i)'s main goal was to bring those local pension boards within the church-plan exemption, so as to ensure that congregational and hierarchical churches would receive the same treatment.  In support of their view, the employees cite several floor statements in which the amendment's sponsors addressed that objective. See Brief for Respondents 38.  Senator Talmadge, for example, stated that under the amendment, a "plan or program funded or administered through a pension board . . . will be considered a church plan."  124 Cong. Rec. 16523; see also 124 Cong. Rec. 12107 (remarks of Rep. Conable).

But that account of subparagraph (C)(i)'s primary purpose cuts against, not in favor of, the employees' position. See Brief for United States as *Amicus Curiae* 21 (accepting the employees' narrative, but arguing that it buttresses the opposite conclusion).   That is because, as hearing testimony disclosed, plans run by church-affiliated pension boards came in different varieties: Some were created by church congregations, but others were established by the boards themselves.  See, *e.g.,* Hearings on S. 1090 et al. before the Subcommittee on Private Pension Plans and Employee Fringe Benefits of the Senate Committee on Finance, 96th Cong., 1st Sess., 400–401, 415–417 (1979). And still others were sufficiently old that their provenance could have become the subject of dispute.  See *id.,* at 411; 125 Cong. Rec. 10052 (remarks of Sen. Talmadge) ("The average age of a church plan is at least 40 years").  So keeping  the  church-establishment  requirement  would have prevented some plans run by pension boards—the very entities the employees say Congress most wanted to benefit—from qualifying as "church plans" under ERISA. No argument the employees have offered here supports that goal-defying (much less that text-defying) statutory construction.

Opinion of the Court

### III

ERISA provides (1) that a "church plan" means a "plan established and maintained . . . by a church" and (2) that a "plan established and maintained . . . by a church" is to "include[] a plan maintained by" a principal-purpose organization.   Under the best reading of the statute, a plan maintained by a principal-purpose organization therefore qualifies as a "church plan," regardless of who established it.   We accordingly reverse the judgments of the Courts of Appeals.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of these cases.

Cite as:  581 U. S. ____ (2017)          1

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

Nos. 16–74, 16–86, and 16–258

————

## ADVOCATE HEALTH CARE NETWORK, ET AL., PETITIONERS

16–74          *v.*

## MARIA STAPLETON, ET AL.;

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT


## SAINT PETER'S HEALTHCARE SYSTEM, ET AL., PETITIONERS

16–86          *v.*

## LAURENCE KAPLAN; AND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT


## DIGNITY HEALTH, ET AL., PETITIONERS

16–258          *v.*

## STARLA ROLLINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


[June 5, 2017]

JUSTICE SOTOMAYOR, concurring.

The Employee Retirement Income Security Act of 1974
(ERISA) protects employees by ensuring "'that if a worker
has been promised a defined pension benefit upon retire-
ment—and if he has fulfilled whatever conditions are
required to obtain a vested benefit—he will actually re-
ceive it.'" *Lockheed Corp.* v. *Spink,* 517 U. S. 882, 887

2        ADVOCATE HEALTH CARE NETWORK *v.* STAPLETON

SOTOMAYOR, J., concurring

(1996).  Any decision interpreting the provisions governing
which employers are subject to ERISA is ultimately a
decision about which employees receive this assurance.
Today, by holding that ERISA's exemption for "church
plan[s]," 29 U. S. C. §1003(b)(2), covers plans neither
established nor maintained by a church, the Court holds
that scores of employees—who work for organizations that
look and operate much like secular businesses—
potentially might be denied ERISA's protections.  In fact,
it was the failure of unregulated "church plans" that
spurred cases such as these.  See, *e.g.,* Brief for Respond-
ents 7–8 (collecting cases and press reports of church plan
failures).

I join the Court's opinion because I am persuaded that it
correctly interprets the relevant statutory text.  But I am
nonetheless troubled by the outcome of these cases.  As
the majority acknowledges, *ante,* at 12, the available
legislative history does not clearly endorse this result.
That silence gives me pause: The decision to exempt plans
neither established nor maintained by a church could have
the kind of broad effect that is usually thoroughly debated
during the legislative process and thus recorded in the
legislative record.  And to the extent that Congress acted
to exempt plans established by orders of Catholic Sisters,
see *ibid.*, it is not at all clear that Congress would take the
same action today with respect to some of the largest
health-care providers in the country.  Despite their rela-
tionship to churches, organizations such as petitioners
operate for-profit subsidiaries, see Dignity Health and
Subordinate Corporations, Consolidated Financial State-
ments as of and for Years ended June 30, 2016 and 2015
and Independent Auditors' Report, p. 50, https://emma.
msrb.org/ES823341-ES646022-ES1041174.pdf  (as  last
visited  June 1, 2017); employ thousands of employees,
App. 774; App. to Pet. for Cert. in No. 16–74, pp. 5a, 31a;
earn billions of dollars in revenue, *ibid.*; and compete in

Cite as:  581 U. S. ____ (2017)           3

SOTOMAYOR, J., concurring

the secular market with companies that must bear the
cost of complying with ERISA.  These organizations thus
bear little resemblance to those Congress considered when
enacting the 1980 amendment to the church plan defini-
tion.  This current reality might prompt Congress to take
a different path.

In the end, I agree with the majority that the statutory
text compels today's result.  Other provisions also impact
the scope of the "church plan" exemption.  Those provi-
sions—including the provisions governing which organiza-
tions qualify as principal  purpose organizations permitted
to establish and maintain "church plans," see, *e.g.*, *ante*, at
6, n. 3—need also be construed in line with their text and
with a view toward effecting ERISA's broad remedial
purposes.