UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LAURENCE KAPLAN, on behalf of himself, individually, and on behalf of all others similarly situated, | : : : | Civil Action No. 13-2941 (MAS)(TJB) |
| Plaintiff, | : | Honorable Michael A. Shipp |
| v. | : | United States District Judge |
| SAINT PETER'S HEALTHCARE SYSTEM, et al., | : : | Motion Returnable: January 3, 2022 |
| Defendants. | : | Oral Argument Requested |
| | : | |
| | : | (Electronically Filed Document) |
| | : | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY
JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

---

SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
James M. Hirschhorn
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
jgreenbaum@sillscummis.com
jhirschhorn@sillscummis.com
klieb@sillscummis.com

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

PROCEDURAL HISTORY ................................................................. 3

STATEMENT OF FACTS ................................................................... 5

  A. Overview of Saint Peter's ........................................... 5

  B. Overview of the Saint Peter's Retirement Plan ......................... 7

  C. The Saint Peter's Retirement Plan Committee ........................... 8

    1. Overview of the Plan Committee Members ................... 9

    2. Duties of the Plan Committee ......................................... 10

    3. Meetings of the Plan Committee ................................... 12

    4. Amendments and Termination of the Plan .................... 13

    5. Funding of the Plan ......................................................... 15

    6. Role of Outside Advisors ............................................... 16

ARGUMENT ..................................................................................... 18

  I. Saint Peter's Plan is Maintained by a Principal Purpose
    Organization ....................................................................... 18

  A. Saint Peter's And Its Plan Committee Are Controlled By
    And Associated With The Roman Catholic Church ................ 21

    1. Control ............................................................................ 21

    2. Association ...................................................................... 24

    3. The Plan Committee is Controlled by and
      Associated with the Church .......................................... 26

  B. The Plan Committee Maintains The Plan ................................ 26

  C. The Plan Committee Is A Principal Purpose Organization
    Controlled By The Church ..................................................... 30

CONCLUSION .................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Advocate Health Care Network v. Stapleton*,
   137 S.Ct. 1562 (2017)..........................................................................1, 3, 19, 20

*Boden v. St. Elizabeth Med. Cntr.*,
   404 F. Supp. 1076 (E.D. Ky. 2019).............................................................*passim*

*Catholic Charities of Me., Inc. v. City of Portland*,
   304 F. Supp. 2d 77 (D.Me. 2004).........................................................23, 24, 25

*Gould v. Am.-Hawaiian S.S. Co.*,
   535 F.2d 761 (3d Cir. 1976).................................................................................22

*Hall v. USAble Life*,
   774 F. Supp. 2d 953 (E.D. Ark. 2011)................................................................26

*Lown v. Continental Cas. Co.*,
   238 F.3d 543 (4th Cir. 2001).......................................................................22, 23

*Medina v. Catholic Health Initiatives*,
   877 F.3d 1213 (10th Cir. 2017)..................................................................*passim*

*Overall v. Ascension*,
   23 F. Supp. 3d 816 (E.D. Mich. 2014).................................................23, 24, 25

*Rinehart v. Life Ins. Co. of N. America*
   2009 U.S. Dist. LEXIS 32864 (W.D. Wa. Aug. 4, 2009)...........................24, 25

*Sanzone v. Mercy Health*,
   954 F.3d 1031 (8th Cir. 2020)....................................................................*passim*

*Smith v. OSF Healthcare System*,
   933 F.3d 859 (7th Cir. 2019)......................................................................20, 29, 30

*Taniguchi v. Kan Pac Saipan Ltd.*
   566 U.S. 560 (2012)..............................................................................................27

*Vorcheimer v. Philadelphia Owners' Assn.*
   903 F.3d 100 (3d Cir. 2018).................................................................................27

**STATE CASES**

*Casey v. Brennan*,
  780 A.2d 553 (N.J. App. Div. 2001), *aff'd* 801 A.2d 245 (N.J. 2002) ...................................................................................22

*Hill Dredging Co. v. Risley*,
  114 A.2d 697 (N.J. 1955) ...................................................22

*Muellenberg v. Bikon Corp.*,
  669 A.2d 1382 (N.J. 1996) .................................................22

**FEDERAL STATUTES**

26 U.S.C. § 414(e)(3) ........................................................22

26 U.S.C. § 7805 ...............................................................22

28 U.S.C. § 1292(b) .............................................................3

29 U.S.C. § 1002(33) ...........................................................3

29 U.S.C. § 1002(33)(c)(i) ..........................................19, 26, 30, 33

29 U.S.C. § 1003(5) .............................................................3

Employee Retirement Income Security Act of 1974 .............................11

ERISA § 3(33) ...............................................................8, 21

ERISA § 3(33)(C)(iv) ..........................................................24

Internal Revenue Code § 414(e) .................................................8

Internal Revenue Code § 415 ...................................................14

**STATE STATUTES**

N.J.S.A. 15A:5-9 and 10, 6-3(c) ...............................................24

**REGULATIONS**

17 C.F.R. § 240.12b-2 .........................................................22

26 C.F.R. § 1.414(e)-1(d)(2) ...............................................22, 23

IRS Gen. Counsel Mem. 39007 (July 1, 1983), 1983 GCM LEXIS 54 ...........24, 26

**OTHER AUTHORITIES**

Black's Law Dictionary ...............................................................................27

Oxford English Dictionary..........................................................................27

Webster's Third International ......................................................................27

## PRELIMINARY STATEMENT

In *Advocate Health Care Network v. Stapleton*, 137 S.Ct. 1562 (2017), the Supreme Court held that the retirement plan of a nonprofit healthcare system controlled by or associated with a church can qualify for the Church Plan Exemption from ERISA if the retirement plan is maintained by an organization, also controlled by or affiliated with a church, whose principal purpose is to administer or fund the plan.  On this motion for partial summary judgment, the issues before this Court are whether the Saint Peter's Retirement Plan Committee ("Plan Committee" or "Committee") both maintains the Saint Peter's Retirement Plan ("Plan") and constitutes a principal purpose organization ("PPO").  Based on the decisions of the two Courts of Appeal that have considered these issues since *Advocate*, the undisputed material facts demonstrate that the Plan Committee satisfies both criteria, and that the Saint Peter's Plan therefore qualifies as a church plan under the Church Plan Exemption.  Plaintiff's challenge to the constitutionality of the statute is reserved for another day.

The Committee is a committee of Saint Peter's Board of Governors.  Saint Peter's itself is both controlled by and associated with the Roman Catholic Diocese of Metuchen, and the members of the Committee are appointed by the Bishop of Metuchen.  Under Saint Peter's Bylaws and the terms of the Plan, the Committee has the power and duty to administer all aspects of the Plan, including determining

1

investment policy, evaluating claims, and selecting and overseeing the work of professional advisors.  The Committee likewise has the power to determine the Plan's funding level and to initiate changes to the Plan.  The Committee actually exercises those powers.  ERISA does not define what it means to "maintain" a retirement plan.  Established principles of statutory construction require that "maintain" receive its ordinary meaning, which is to care for or keep up some object.  The Committee therefore maintains the Plan by administering it and determining how it is to be funded.

The Committee also qualifies as a principal purpose organization.  ERISA provides that such an organization may be "a civil law corporation or otherwise." The statute does not require that the PPO be a separate legal person from the entity that has established the retirement plan.  Instead, it may be a committee or component of the establishing entity whose function is to administer the Plan and determine its funding.  As a committee of the Saint Peter's Board whose exclusive function is the administration and funding of the Plan, the Committee qualifies as a PPO.  As a committee of the Saint Peter's Board, moreover, it shares Saint Peter's control by and association with the Diocese of Metuchen.

Accordingly, the Saint Peter's Plan qualifies for the Church Plan Exemption because it is maintained by the Committee, an organization whose principal

purpose is to administer the Plan and determine its funding, and which is controlled by and associated with the Roman Catholic Church.

## PROCEDURAL HISTORY

The Complaint in this action was filed on May 7, 2013.  (ECF No. 1.) Defendants moved to dismiss for lack of subject matter jurisdiction and failure to state a claim on August 13, 2013.  (ECF No. 42.)  The motion was denied on March 31, 2014 on the ground that Saint Peter's was not a church and that the Retirement Plan it established was therefore not exempt from ERISA under the Church Plan Exemption, 29 U.S.C. §§ 1002(33), 1003(5).  (ECF Nos. 67, 68.)

Defendants moved for leave to appeal pursuant to 28 U.S.C. § 1292(b) on April 14, 2014 (ECF No. 74), and this Court granted leave to appeal on September 19, 2014 (ECF Nos. 110, 111).  The Third Circuit accepted the interlocutory appeal and affirmed the denial of the motion to dismiss on March 28, 2016.  (ECF No. 130.)

The Supreme Court granted certiorari.  In *Advocate Health Care Network v. Stapleton*, 137 S.Ct. 1562 (2017), the Supreme Court reversed the Third Circuit, holding that a nonprofit healthcare system controlled by or associated with a church could qualify as a church plan.  It remanded for further proceedings to determine whether the Saint Peter's Plan met the criteria of the Exemption and qualified.  On July 13, 2017, as amended on January 29, 2018, the Third Circuit

3

vacated its prior ruling and remanded the matter to this Court for further proceedings.  (ECF Nos. 159, 164, 174.)

On remand, Plaintiff filed an Amended Complaint that includes pendant state law causes of action.  (ECF No. 195.)  Defendants moved to dismiss (ECF No. 200), and Plaintiff moved to strike the Certifications of Garrick Stoldt and Mgr. John Fell supporting Defendants' motion (ECF No. 202).  On April 30, 2019, the Court denied both motions (ECF Nos. 214, 215).  Defendants answered on May 14, 2019.  (ECF No. 219.)

On June 13, 2019, the parties stipulated that they would "limit discovery and dispositive motion practice to the issue of whether Saint Peter's Healthcare System's pension plan (the "Plan") is 'maintained' by a 'principal purpose organization' as those terms are defined by ERISA's church plan exemption provision."  (Certification of Jeffrey J. Greenbaum, dated September 30, 2021 ("*Greenbaum Cert.*"), Ex. A.)  The Court so-ordered this stipulation on June 17, 2019.  (ECF No. 222.)  During the next two years, the parties engaged in extensive document discovery from Saint Peter's, supervised by U.S. Magistrate Judge Tonianne J. Bongiovanni, and completed the deposition of Saint Peter's Chief Financial Officer, Garrick Stoldt, a member of the Plan Committee.  On August 20, 2021, the Court directed that the parties submit cross-motions for summary judgment on the foregoing issues on September 30, 2021.  (ECF No. 245.)  In

4

accordance with the August 20, 2021 Order, these cross-motions do not address the constitutionality of the church plan exemption.

## STATEMENT OF FACTS

### A.     Overview of Saint Peter's

Saint Peter's Healthcare System, Inc. ("Saint Peter's") is a nonprofit healthcare system, owned, and controlled by the Roman Catholic Diocese of Metuchen.  (Certification of Garrick Stoldt, dated September 30, 2021 ("*Stoldt Cert.*"), ¶ 3.)  The Diocese of Metuchen owns Saint Peter's because the Roman Catholic Bishop of Metuchen (the "Bishop"), in his official capacity, is the sole member of the corporation.  (*Id.*)  Saint Peter's was incorporated in 1908 by the Roman Catholic Diocese of Trenton and has belonged to the Diocese of Metuchen since that diocese was established in 1981.  (*Id.*)  Saint Peter's is a *public juridic* person under the canon law of the Roman Catholic Church (the "Church").  (*Id.*)

Saint Peter's operates Saint Peter's University Hospital, located in New Brunswick, New Jersey, and other wholly owned nonprofit healthcare subsidiaries that participate in the Saint Peter's Healthcare System Retirement Plan (the "Plan").  (*Id.* ¶ 4.)  Its purposes are "to care, cure, nurture and maintain sick and infirm persons" and to "own, maintain, operate, or assist in the operation of one or more Catholic hospitals."  (*Id.* ¶ 5, Ex. A, ¶ 4.)

The Roman Catholic Bishop of Metuchen is the sole Member of Saint Peter's under the Nonprofit Corporation law.  (*Id*. ¶ 6, Ex. A, ¶ 9.)  Management of Saint Peter's is vested in its Board of Governors ("Board").  (*Id*., Ex. A, ¶ 10.)  All of the members of the Board except two are appointed by the Bishop, and all may be removed by the Bishop with or without cause.  (*Id*., ¶ 8, Ex. B, Art. IV, § 2.)  The President and CEO of Saint Peter's is a member of the Board, as is the Episcopal Vicar for the Healthcare Apostolate for the Diocese of Metuchen ("Episcopal Vicar"), who sits as the Bishop's personal representative.  (*Id*., ¶ 9.)  The Bishop has the power to veto any action by the Corporation or its Board.  (*Id*., ¶ 9, Art. III, § 2(e).)  Saint Peter's is listed in the Official Catholic Directory.  (*See* ECF Nos. 200-2, 200-3, *Declaration of Garrick Stoldt*, dated September 7, 2018, ¶ 21, Ex. F.)

Saint Peter's principal officers are also removable by the Bishop with or without cause.  (*Stoldt Cert.* ¶ 10, Ex. B, Art. VII, § 3.)  The Chair of the Board (who is appointed by the Bishop) has a veto over the Board's actions.  (*Id*., Art. IV, § 9.)

Saint Peter's Certificate of Incorporation and Bylaws declare that its mission is to carry out the healing mission of the Church by providing health care in accord with the Ethical and Religious Directives for Catholic Healthcare Institutions ("ERDs").  (ECF No. 43, Certification of Garrick Stoldt, dated August 12, 2013, ¶¶

6

3, 12-13; *Stoldt Cert*., Ex. A, ¶ 4, Ex. B, Art. I, § 2(b)).  All employees, whether

Catholic or not, must uphold the Saint Peter's mission in accordance with the

ERDs.  (ECF No. 43, ¶ 27).  Saint Peter's owner, the Diocese of Metuchen, is

directly responsible for that mission, which the Bishop carries out through his

control of the Saint Peter's Board and through his appointment of his Episcopal

Vicar to oversee Saint Peter's compliance with the ERDs.  (ECF No. 43, ¶¶ 4-10;

ECF No. 42-10, Declaration of Monsignor John Fell, dated August 8, 2013, ¶¶ 5,

13-17.)  Saint Peter's provides Catholic religious facilities and services to its

patients.  (ECF No. 42-10, ¶¶ 18-22.)  Saint Peter's also receives a blanket federal

income tax exemption available to all institutions listed in the Catholic Directory.

(ECF No. 43, ¶ 18, Ex. D.)

**B.    Overview of the Saint Peter's Retirement Plan**

Saint Peter's is the sponsor of the Plan.  (*Stoldt Cert.* ¶ 12, Ex. C, at 1.)  As

the Plan sponsor, Saint Peter's provides monetary contributions to the Plan in

amounts recommended by the Plan Committee and represents the corporate entities

covered under the Plan.  (*Id*., ¶ 12; *see also Greenbaum Cert*., Ex. B, Stoldt Tr.

198:3-11 (hereinafter "Stoldt Tr.").)[1]  The Plan is a non-contributory defined

---

[1]    Monetary contributions to the Plan come from both Saint Peter's and
Saint Peter's University Hospital based on the number of employees covered by
the Plan in each entity.  (*Stoldt Cert*. ¶ 12; Stoldt Tr. at 34:13-21.)

benefit retirement plan that covers substantially all Saint Peter's employees hired before July 1, 2010.  As of that date, Saint Peter's closed the Plan to new entrants and established a defined contribution plan for those hired after the closure date. (*Stoldt Cert.* ¶ 13.)  As of December 31, 2012, Saint Peter's froze the defined benefit plan as to additional accruals for all participants (the Plan at issue in this litigation) and substituted a defined contribution plan for all employees on a going forward basis.  (*Id.*, ¶ 14.)

The Plan is a church plan as defined in section 414(e) of the Internal Revenue Code and section 3(33) of ERISA.  (*Id.*, ¶ 15, Ex. C, at 1.)  On August 14, 2013, the IRS issued a private letter ruling that the Plan was exempt from ERISA as a church plan.  (*Id.*, ¶ 16, Ex. D.)

## C.   <u>The Saint Peter's Retirement Plan Committee</u>

The Saint Peter's Plan is administered and maintained by the Plan Committee (the "Plan Committee").  (*Id.*, ¶ 56.)  As detailed below, the Plan Committee derives its authority to maintain the Plan from both the Saint Peter's Bylaws and the Plan itself.  As further demonstrated below, the Plan Committee actively fulfills its responsibility to administer and maintain the Plan through its quarterly meetings at which it receives the advice of its actuaries, investment

advisors, counsel and other professionals, and makes all key decisions necessary to carry out its functions.

1.  **Overview of the Plan Committee Members**

Saint Peter's Bylaws provide for the establishment of certain committees, including the Plan Committee.  (*Id*., ¶ 17, Ex. B, Art. V.)  Per Article V, Section 13(a) of the Bylaws, the Plan Committee shall consist of the "Chair, who shall serve ex officio with vote, the Corporation's Chief Financial Officer and the Corporation's Vice President for Human Resources, each of whom shall serve ex officio without vote, and not more than seven (7) additional Governors."  (*Id*., ¶ 18, Art. V, § 13(a).)  The additional members of the Plan Committee may consist of employees of Saint Peter's, members of the Medical/Dental staff, and individuals from the local community served by Saint Peter's.  (*Id*., ¶ 19.)  The Plan provides for a minimum of three members on the Plan Committee.  (*Id*., ¶ 20, Ex. C, § 8.01; *see also* Stoldt Tr. at 21:19-5 (noting that the Committee has historically had between four and seven members)).

The Plan requires all members of the Plan Committee to be appointed by the Bishop.  (*Id*., Ex. C, § 1.10.)  Recommendations for potential Committee members are typically made to the CEO.  The CEO then makes his recommendations for candidates to the Bishop.  The Bishop ultimately decides which candidates to

appoint and appoints the Plan Committee members.  (*Id*., ¶ 21; *see also* Stoldt Tr. at 24:3-11.)

Consistent with Article V, § 13(a) of the Bylaws, the Plan Committee may include both current Board members and individuals that are not currently serving on the Board.  (*Stoldt Cert.*, Ex. B, Art. V, § 13(a); *see also* Stoldt Tr. at 24:21-25:12.)  The Committee currently has four voting members: Board Chairman Vincent Dicks, the Episcopal Vicar (Monsignor John Fell), John Fenton, and Leslie Hirsch (also President and CEO).  Dicks, Monsignor Fell, and Hirsch currently serve on the Board.  (*Id*., ¶ 23.)  Although he does not sit on the Board, Fenton was selected to serve on the Plan Committee due to his financial expertise. (*Id*.; *see also* Stoldt Tr. at 25:6-9.) As stated in the Bylaws, the CFO, Garrick Stoldt, and the Vice President for Human Resources also sit on the Committee ex officio, without a vote.  (*Stoldt Cert.* ¶ 30, Ex. B, Art. V, § 13(a).)

### 2.    **Duties of the Plan Committee**

The Bylaws set forth a number of duties of the Plan Committee, including:

(1) Possess overall responsibility for the oversight of the retirement plans sponsored by the Corporation;
(2) Oversee the management of plan assets relating to the defined benefits pension and other retirement and savings plans maintained by the Corporation;
(3) Review the Corporation's policy for funding its retirement plans;
(4) Receive and review periodic reports on the administration and operation of the Corporation's retirement plans to ensure the achievement of their intended purposes;

10

(5) Act on behalf of the Board with respect to the appointment and termination of Governors, third party administrators, investment managers, named fiduciaries or other positions relating to the retirement plans;

(6) Approve on behalf of the Board any amendment to the Corporation's retirement plans or do any other task with respect to the retirement plans that requires action by the Board;

(7) Receive periodic briefings regarding compliance with funding and other regulatory requirements, including the Employee Retirement Income Security Act of 1974, as amended;

(8) Review periodically the performance of any third parties engaged in the administration, management or investment of funds of any Corporation retirement plan, and to review the recommendations of management with respect to the engagement or termination of any third parties; and

(9) Perform any and all other functions and take any and all other actions as may be directed by the Board from time to time.

(*Id*., ¶ 24, Ex. B, Art. V, § 13(b).)  Stoldt further testified that the "maintenance . . . is done by the retirement committee [as] delegated through the bylaws.  The retirement committee's responsibility is to maintain the plan."  (Stoldt Tr. at 49:10-17.)

The Bylaws do not delegate any authority related to the Plan to other standing committees.  (*Stoldt Cert.* ¶ 25, Ex. B, Art V.)  The Bylaws contemplate that the Investment Committee shall oversee the investments of all corporations of Saint Peter's, including the retirement plans (*id*., Art. V, § 9(b)), but this is purely an oversight duty that has no decision-making or approval authorities.  (*Id*., ¶ 25; *see also* Stoldt Tr. at 110:7-12 ("[The Investment Committee serves] an oversight function, not a – they don't make decisions on investments directly."))

11

The Plan addresses "Administration" in Article 8.  Pursuant to Section 8.01, "[t]he Plan shall be administered by the Committee as agent of the Employer." (*Stoldt Cert.* ¶ 26, Ex. C, § 8.01.)  The Plan Committee has exclusive discretionary authority over all aspects of the Plan, including management of Plan assets, determining eligibility for benefits, construing the provisions of the Plan, and directing disbursements under the Plan.  (*Id.*, ¶ 27, Ex. C, ¶ 8.02.)

### 3.   <u>Meetings of the Plan Committee</u>

The Plan Committee typically meets on a quarterly basis.  (*Id.*, ¶ 28; *see also* Stoldt Tr. at 20:12-15.)  The discussions of the Plan Committee are memorialized in detailed minutes for each meeting.  During the course of discovery, Defendants produced the minutes of the Plan Committee spanning from May 7, 2007 to February 20, 2019, which showed that the Plan Committee met approximately 50 meetings during this almost 12-year period.  (*Stoldt Cert.* ¶ 29.)  The minutes contain the date, the attendees, and a detailed description of the subject matter of the discussion, which is broken down by topic with corresponding headings.  (*Id.*)

The Plan Committee meetings are attended by (i) voting Plan Committee members, (ii) the Chief Financial Officer and Vice President of Human Resources, who the Bylaws indicate are Plan Committee members without vote, (iii) employees of Saint Peter's who support the Plan Committee, (iv) various

professionals, such as representatives of actuaries, their investment advisor, and counsel.  (*Id.*, ¶ 30; Stoldt Tr. at 20:16-24, 22:6-9.)

The minutes reflect the recommendations made by the professionals, the deliberations of the Plan Committee and the decisions made.  The minutes also attach those materials reviewed at or related to each meeting, such as reports and presentations from the actuaries or investment advisors, resolutions of the Plan Committee, legal memoranda, or documentation related to pertinent Plan Committee business.  (*Stoldt Cert.* ¶ 31.)

### 4.    <u>Amendments and Termination of the Plan</u>

The Plan contemplates the amendment of the Plan by the Corporation, which duty is delegated to the Plan Committee pursuant to the Bylaws.  (*Id.*, ¶ 32, Ex. B, Art. V, § 13(b), Ex. C, § 9.01.)  As Stoldt testified, "[a]ll discussions about [the] Plan, Plan amendments, any changes whatsoever is the function of the retirement committee.  There is no top-down decision-making of the retirement plan."  (Stoldt Tr. at 45:24-46:4.)

Where there is a "minor" amendment to the Plan, it is typically moved by a vote of the Committee alone, without Board discussion.  (*Stoldt Cert.* ¶ 33; Stoldt Tr. 46:8-13.)  For example, as reflected in the Plan Committee minutes, the Plan Committee discussed and adopted the Seventh Amendment to the Plan on November 19, 2008, which was based on the recommendations of the actuary.

13

(*Stoldt Cert*. ¶ 34, Ex. E.)  The Seventh Amendment concerned, among other things, changes made to the Plan "to comply with changes made to the benefit limitations under Section 415 of the Internal Revenue Code."  (*Id*.)  No minutes of the Board reflect any discussion of this Seventh Amendment prior to the execution of the Board resolution effectuating the amendment on December 11, 2008.  (*Id*., ¶ 34.)

The Board votes on "major" amendments to the Plan, such as the decisions to restrict the participation of new employees made in 2010 and to freeze the Plan for additional accruals made in 2012.  (*Id*., ¶ 35; *see also* Stoldt Tr. at 46:8-18.) The Board becomes involved in those major amendments because such amendments typically require Saint Peter's to take additional action unrelated to the Plan – for example, when the Plan Committee recommended to exclude new hires from the Plan, that decision was approved by the Board because of the need to create a replacement plan for new employees.  (*Id*., ¶ 36; *see also* Stoldt Tr. at 70:11-22.)  The minutes of the Plan Committee from May 26, 2010 reflect the internal deliberations concerning the adoption of the Tenth Amendment concerning this action.  (*Stoldt Cert*. ¶ 37, Ex. F.)  The subsequent Board minutes from June 2, 2010 reflect the Board's approval of the Tenth Amendment, as well as additional discussions over the general trend for hospitals to offer defined contribution plans and bids being solicited for same.  (*Id*., ¶ 38, Ex. G.)  For the same reason, the

Board was also involved in the 2012 decision to freeze accruals to the Plan as of December 31, 2012, and to substitute a defined contribution plan going forward. (*Id*., ¶ 39, Ex. H.)  The implementation of this change was made through action of the Plan Committee.  (*Id*., ¶ 39, Ex. I.)

The System also retains the right to terminate the Plan, which duty is also delegated to the Committee.  (*Id*., ¶ 40, Ex. B, Art. V, § 13(b) ("The Retirement Plan Committee shall . . . [a]pprove on behalf of the Board any amendment to the Corporation's retirement plans or do any task with respect to the retirement plans that requires action by the Board. . . ."); Ex. C, § 9.02 ("[T]he System reserves the right to terminate the Plan (in whole or in part) at any time and from time to time, for any reason whatsoever."))  The Plan Committee would initiate any decision to terminate the Plan, which recommendation would then be voted on by the Board. (*Id*., ¶ 41; *see also* Stoldt Tr. at 48:10-24.)

### 5.   Funding of the Plan

The Plan Committee also determines the amount of annual contributions to the Plan.  The Plan Committee typically decides on an annual funding amount, and the Plan is funded on a weekly basis.  (*Stoldt Cert*. ¶ 42; Stoldt Tr. at 54:20-23.)

The Plan Committee determines an annual amount of funding at its third meeting of each year.  The actuaries provide a recommended funding contribution, which is reviewed and discussed by the Plan Committee.  (*Stoldt Cert*. ¶ 43; *see*

*also* Stoldt Tr. at 35:16-25.)  The Plan Committee then votes on the amount of the monetary contribution at Plan Committee meetings, which amount is then added to the budget for Saint Peter's for the next upcoming year.  (*Stoldt Cert*. ¶ 44; Stoldt Tr. at 34:22-35:22, 51:12-17.)  The Finance Committee subsequently approves the budget, followed by a separate approval by the Board of Governors.  (*Stoldt Cert*. ¶ 44; *see also* Stoldt Tr. 35:11-36:5.)

Although additional approvals are made by the Finance Committee and Board, in actuality, the Plan Committee is ultimately responsible for the determination of the final amount of funding.  (*Stoldt Cert*. ¶ 45.)  According to Garrick Stoldt, for his entire tenure as CFO since 2007, neither the Finance Committee nor the Board has ever sought to change the amount of the recommended funding by the Plan Committee.  (*Id*.; *see also* Stoldt Tr. 36:4-37:8.)

### 6.   <u>Role of Outside Advisors</u>

The Plan expressly recognizes the Plan Committee's authority to delegate duties and engage experts as it deems appropriate in connection with the administration of the Plan.  (*Stoldt Cert*. ¶ 46, Ex. C, § 8.03.)  To that end, the Plan Committee has standing agreements with its actuaries, currently Willis Towers Watson, and its investment advisor, currently NEPC, to assist with the Plan Committee's maintenance and administration of the Plan.  The Plan Committee also obtains advice from counsel as to legal matters.  (*Id*., ¶ 47.)

16

The Plan Committee manages the relationships with and makes any decisions with respect to the selection or termination of outside experts. (*Id*., ¶ 48.) For example, at an Executive Session of the Plan Committee held on September 19, 2012, the attendees discussed their dissatisfaction with their then current actuary and approved a motion to authorize a bidding process for new actuarial services. (*Id*., ¶ 49, Ex. J.)

The investment advisor oversees the portfolio, makes recommendations on individual investments, monitors any underperformance of investments or managers, and advises on investment performance of the Plan over an extended period of time. (*Stoldt Cert*. ¶ 50; *see also* Stoldt Tr. at 179:22-180:8.) A representative from the investment advisor also routinely attends Plan Committee meetings. The Plan Committee ultimately is free to adopt or reject the recommendations of the investment advisor as it deems appropriate. (*Stoldt Cert*. ¶ 51.)

The Plan Committee also maintains an investment policy governing the types of investments utilized by the Plan. (*Id*., ¶ 52.) As part of its responsibilities, the investment advisor periodically reviews the investment policy, recommends new types of investments to the Plan Committee, and assists with the preparation of the policy. (*Id*.; *see also* Stoldt Tr. at 156:14-157:10.) The investment advisor also monitors compliance with the Socially Responsible Investment Guidelines

17

promulgated by the U.S. Conference of Catholic Bishops.  (*Stoldt Cert*. ¶ 52.)
Ultimately, the Plan Committee, under its delegated responsibility, adopts the
investment policy.  (*Id*., ¶ 53.)  For example, at the February 25, 2014 meeting of
the Plan Committee, the investment advisor presented proposed changes to the
Investment Policy Statement, which the Plan Committee voted on and approved.
(*Id*., ¶ 53, Ex. K.)

The Plan's actuary works routinely with the Plan Committee, and a
representative from the actuary attends Plan Committee meetings.  (*Id*., ¶ 54.)  The
actuary provides a variety of reports and statements to the Plan Committee,
including actuarial calculations required for financial statements, recommendations
on funding level for the Plan, calculations of funded status, and studies of the
assumptions of the Plan.  (*Id*.; *see also* Stoldt Tr. at 188:6-20.)  The actuary also
actively monitors new laws pertaining to the Plan and makes recommendations on
any necessary amendments to the Plan.  (*Id*., ¶ 54.)  As with the investment
advisor, the Plan Committee may adopt or reject the recommendations of the
actuary as it sees fit.  (*Id*., ¶ 55.)

## **ARGUMENT**

## I.   **SAINT PETER'S PLAN IS MAINTAINED BY A PRINCIPAL PURPOSE ORGANIZATION**

ERISA defines an exempt church plan as:

18

A plan established and maintained for its employees . . . by a church or by a convention or association of churches including a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(c)(i).

In *Advocate Health Care Network v. Stapleton*, 137 S.Ct. 1562 (2017), the Supreme Court, reversing the Third Circuit in this case, held that an exempt church plan may include a plan established by a non-profit healthcare system controlled or associated with a church, provided that the plan is "maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding" of the plan. (Hereinafter "Principal Purpose Organization" or "PPO").  "Under the best reading of the statute, a plan maintained by a principal purpose organization therefore qualifies as a church plan, regardless of who established it." 137 S.Ct. at 1663.  The issues in this case on remand are therefore whether the Committee of Saint Peter's is a Principal Purpose Organization within the meaning of the statute and whether the Committee, which administers the Saint Peter's Plan and determines the level of its funding, "maintains" the Plan within the meaning of the statute.

19

*Advocate* did not determine whether the retirement plans of Saint Peter's or the other defendant healthcare systems were controlled or associated with a church or maintained by a PPO.[2]  Since *Advocate*, several Courts of Appeal and District Courts have considered the issue of what constitutes a PPO and what constitutes "maintenance" or "funding" of a retirement plan by a PPO.  These decisions have come at various procedural stages of the litigation – on motions to dismiss for failure to state a claim, *Sanzone v. Mercy Health*, 954 F.3d 1031 (8th Cir. 2020), on a motion for summary judgment where more discovery was required, *Smith v. OSF Healthcare System*, 933 F.3d 859 (7th Cir. 2019), and on summary judgment based on a full record, *Medina v. Catholic Health Initiatives,* 877 F.3d 1213 (10th Cir. 2017).

According to *Medina*, the statute imposes a three-part test for whether a plan is maintained by a PPO:

---

[2]      The Supreme Court assumed, for the purposes of its decision, that Saint Peter's and the other petitioners were controlled by or associated with a church.  *Advocate Health Care Network*, 137 S. Ct. at 1656 n.1.  Because this Court and the Third Circuit concluded that only a church could establish a church plan, a result reversed by *Advocate*, they did not reach the issue of whether Saint Peter's was controlled by or associated with a church.  Because the Plan Committee is a component of Saint Peter's, it is necessary to determine whether Saint Peter's is controlled by or associated with a church in order to determine whether the same is true of the Plan Committee.  As demonstrated, *infra*, this can be determined as a matter of law from the documentary proof without the need for further discovery.

> 1. Is the entity a tax-exempt nonprofit organization associated with a church?
>
> 2. If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?
>
> 3. If so, is that principal-purpose organization itself associated with a church?

877 F.3d at 1222. To qualify as an exempt plan, "both the principal-purpose organization and the entity whose employees the plan benefits must be associated with a church." *Id*. Saint Peter's Plan satisfies all three criteria. Both Saint Peter's itself and the Plan Committee are not merely associated with but controlled by the Roman Catholic Bishop of Metuchen. The principal, indeed the only purpose of the Plan Committee is to administer the Plan and to determine its funding. The statute expressly provides that a PPO need not be a separate corporate entity but may be a committee of the entity that established the retirement plan, and the Plan Committee's functions "maintain" the Saint Peter's Plan within the meaning of the statute.

## A.   Saint Peter's And Its Plan Committee Are Controlled By And Associated With The Roman Catholic Church

### 1.   Control

There can be no dispute that Saint Peter's, the entity that established the Plan, is both controlled by and associated with the Roman Catholic Church. Though neither ERISA nor the legislative history of § 3(33) define "control," the

21

term is well understood as a matter of both federal and New Jersey corporate law. SEC regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2, *followed in Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 779 (3d Cir. 1976).  New Jersey defines control of a closely held corporation as "the power to dictate" the corporation's affairs.  *Muellenberg v. Bikon Corp.*, 669 A.2d 1382, 1386-87 (N.J. 1996) (majority ownership); *accord Hill Dredging Co. v. Risley,* 114 A.2d 697, 713 (N.J. 1955) (same); *Casey v. Brennan*, 780 A.2d 553, 571 (N.J. App. Div. 2001), *aff'd* 801 A.2d 245 (N.J. 2002) (control premium is price paid for power to influence corporation's affairs).  The IRS defines control under the parallel provision of the Internal Revenue Code, 26 U.S.C. § 414(e)(3), to include the power to appoint a majority of officers or directors.  26 C.F.R. § 1.414(e)-1(d)(2).[3]  This power alone is sufficient for these purposes to establish control as a matter of law. Control, in sum, is the legal power to direct management of a corporation, or to directly influence management by the appointment of the governing body and other officers.

---

[3]       Since the IRS has authority to promulgate regulations implementing all provisions of the Code, *see* 26 U.S.C. § 7805 (general rulemaking authority), its definition of control governs.  *See Lown v. Continental Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001).

22

Under this standard, it cannot be disputed that Saint Peter's is controlled by the Diocese of Metuchen and hence by the Church. "An organization is controlled by a church when, for example, a religious institution appoints a majority of the organization's officers or directors." *Lown*, 238 F.3d at 547, *citing* 26 C.F.R. § 1.414(e)-1(d)(2); *see also Overall v. Ascension,* 23 F. Supp. 3d 816, 829-31 (E.D. Mich. 2014) (control through appointment of officers and directors); *Catholic Charities of Me., Inc. v. City of Portland*, 304 F. Supp. 2d 77, 85 (D.Me. 2004) (corporate control is control for ERISA purposes); *Boden v. St. Elizabeth Med. Cntr.*, 404 F. Supp. 1076, 1083 (E.D. Ky. 2019) (control by bishop over "aspects" of hospital's operations).

The Church's control of Saint Peter's far exceeds that standard. The Bishop is the sole member of Saint Peter's. (*Stoldt Cert.* ¶ 6, Ex. A, ¶ 9.) The sole member of a New Jersey non-profit corporation is the equivalent of a sole shareholder of a for profit corporation. *See* N.J.S.A. 15A:5-9 and 10, 6-3(c). He appoints all but two members of the Saint Peter's Board, and all members are removable at his pleasure with or without cause. (*Id.* ¶ 8, Ex. B, Art. IV, § 2.) For the Board to act, the Chair (whom the Bishops appoints) must be in the majority. (*Id.* ¶ 10, Ex. B, Art. IV, § 9.) The Bishop has the power to veto any action of the Board. (*Id.* ¶ 9, Art. III, § 2(e).) The Bishop also appoints the Chair and Vice Chair of the Board, the President and Chief Executive Officer, the Treasurer and

23

Chief Financial Officer, the Secretary and the Assistant Secretary of Saint Peter's in his sole discretion, and they all serve at his pleasure.  (*Id*. ¶ 10, Ex. B, Art. VII, § 3.)  The exclusive right to appoint almost all board members and remove all board members "more than satisfies" the requirement of control.  *Rinehart v. Life Ins. Co. of N. America* 2009 U.S. Dist. LEXIS 32864 (W.D. Wa. Aug. 4, 2009) at *14; *accord Overall, supra; Catholic Charities*, 304 F. Supp. 2d at 85.  Hence, the Saint Peter's Plan is established by an institution controlled by the Church.

### 2.   <u>Association</u>

An entity is associated with a church "if it shares common religious bonds and convictions with that church."  ERISA § 3(33)(C)(iv).  Because an institution may be associated with a church even if it is not controlled by it, *Catholic Charities*, 304 F. Supp. 2d at 85, it follows that an institution controlled by a church is associated with the church that controls it. *See Medina*, 877 F.3d at 1222 ("public juridic person" established under canon law is associated with the Roman Catholic Church).

The courts and the IRS recognize any organization listed in the *Catholic Directory* as associated with the Roman Catholic Church.  This listing alone is sufficient to establish association.  *See Medina*, 877 F.3d at 1223; *Overall*, 2014 U.S. Dist. LEXIS 64116 at *36-37; *Catholic Charities*, 304 F. Supp. 2d at 85; IRS Gen. Counsel Mem. 39007 (July 1, 1983), 1983 GCM LEXIS 54 at *11-12

(*available at* ECF No. 43-1, Ex. D.)  The Department of Labor assesses the

statutory requirement of "bonds and convictions" by looking at the factors that

tend to assure the organization adheres to the teachings of its church.  *Catholic*

*Charities*, 304 F. Supp. 2d at 85-86.

Saint Peter's is closely associated with the Catholic Church.  Its certificate of

incorporation and bylaws declare that its mission is to carry out the healing mission

of the Roman Catholic Church by providing health care in accord with the Ethical

and Religious Directives for Catholic Healthcare Institutions ("ERDs").  (ECF No.

43, Certification of Garrick Stoldt, dated August 12, 2013, ¶¶ 3, 12-13; *Stoldt*

*Cert*., Ex. A, ¶ 4, Ex. B, Art. I, § 2(b)).  All employees, whether Catholic or not,

must uphold the Saint Peter's mission in accordance with the ERDs.  (ECF No. 43,

¶ 27).  *See Boden*, 404 F. Supp.2d at 1083; *Rinehart*, 2009 U.S. Dist. LEXIS

32864, at *17.  Saint Peter's owner, the Diocese of Metuchen, is directly

responsible for that mission, which the Bishop carries out through his control of

the Saint Peter's Board and through his appointment of his Episcopal Vicar to

oversee Saint Peter's compliance with the ERDs.  (ECF No. 43, ¶¶ 4-10; ECF No.

42-10, Declaration of Monsignor John Fell, dated August 8, 2013, ¶¶ 5, 13-17).

Saint Peter's provides Catholic religious facilities and services to its patients.

(ECF No. 42-10, ¶¶ 18-22.)  Saint Peter's also receives material support from the

Church through the blanket federal income tax exemption available to all

institutions listed in the *Catholic Directory*.  *See Hall v. USAble Life*, 774 F. Supp.

2d 953, 960 (E.D. Ark. 2011) (federal tax exemption held material support by the

Church); (ECF No. 43, ¶ 18, Ex. D (IRS Gen. Counsel Memorandum 39007 (July

1, 1983)).

### 3. The Plan Committee is Controlled by and Associated with the Church

By virtue of the above, the Plan Committee, as a standing committee of the

Board, is controlled by and associated with the Church.  All of its members are

appointed by the Bishop.  (*Stoldt Cert*. ¶ 21, Ex. C, § 1.10.)  Most are Board

members removable by the Bishop with or without cause.  (*Id*., Ex. B, Art. III, §

2(b).)

## B. The Plan Committee Maintains The Plan

ERISA requires that a retirement plan be "maintained" by an organization

"the principal purpose or function of which is the administration or funding of a

plan or program for the provision of retirement benefits."  29 U.S.C. §

1002(33)(c)(i).  Because the statute is disjunctive, maintenance can be either

administration or funding.  The Saint Peter's Committee both administers and

determines the funding of the Plan.

ERISA nowhere defines the term "maintain."  The Courts of Appeal that

have considered the issue have held that, in accord with the usual rules of statutory

construction, this undefined term should be understood in accord with its ordinary

meaning with the aid of dictionary definitions.  *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040-41 (8th Cir. 2020); *Medina*, 877 F.3d at 1225-26; *accord Boden*, 404 F. Supp. 2d at 1085; *see generally Taniguchi v. Kan Pac Saipan Ltd.* 566 U.S. 560, 566 (2012); *Vorcheimer v. Philadelphia Owners' Assn.* 903 F.3d 100, 105 (3d Cir. 2018).  They have followed common dictionary definitions of "maintain." *Sanzone* cites the Oxford English Dictionary definition as "to cause to continue in a specified state, relation or position" and Black's Law Dictionary as "to care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." *Sanzone*, 954 F.3d at 1041.  *Medina* cites the Black's Law definition and also Webster's Third International, "to keep in a state of repair, efficiency or validity."  *Medina*, 877 F.3d at 1226.

Under these definitions, the Plan Committee maintains the Saint Peter's Plan.  Saint Peter's Bylaws grant the Committee "overall responsibility for the oversight" of the Plan.  (*Stoldt Cert*. ¶ 24, Ex. B, Art. V, § 13(b).)  They authorize and direct the Plan Committee to oversee the management of Plan assets, review Saint Peter's funding policy, review periodic reports on the Plan's administration and operation, appoint and terminate outside fiduciaries and other third party administrators, approve amendments to the Plan, and "do any other task . . . that requires action by the Board."  (*Id*.)  The Plan itself declares that the Plan Committee administers the Plan as Saint Peter's agent and exercises full

discretionary authority over management of plan assets, payment of claims, and all other aspects of administration.  (*Id*. ¶¶ 26-27; Ex. C, §§ 8.01, 8.02.)

These are not merely paper responsibilities.  The Committee meets quarterly, attended by its professional advisors and by Saint Peter's CFO and Chief Human Resources Officer.  (*Id*., ¶¶ 28, 30.)  As the minutes of its meetings show, it dealt with a broad range of administrative tasks.  The Committee oversees its outside investment advisors (*id*., ¶¶ 47-48) and determines the Plan's investment policy (*id*., ¶ 52.)  At its third quarterly meeting of the year, the Committee reviews the actuaries' reports and determines the amount of funding required.  The amount fixed by the Committee is added to the Saint Peter's budget and approved by the Finance Committee and the full Board without change.  (*Id*., ¶¶ 43-45.)

Minor amendments to the Plan are essentially acted on by the Committee alone.  (*Id*., ¶¶ 33-34.)  Major amendments are recommended by the Committee and determined by the Board.  A major amendment is one that would require Saint Peter's to take action beyond the administration of the Plan itself, such as the decision to freeze the Plan and make other provision for new employees.  (*Id*., ¶¶ 35-38.)  While the Board has the power to terminate the Plan, that action would be taken only if recommended by the Committee.  (*Id*., ¶¶ 40-41.)[4]

--------

[4]     It is immaterial that the ultimate power to terminate the Plan rests with the Board rather than the Committee.  As *Sanzone* explains, the fact that both Saint

The Committee's formal authority with respect to administration and funding of the Plan and its actual exercise of that authority are equal to or greater than those found to constitute maintenance in *Sanzone*, *Medina*, and *Boden*. *Sanzone,* 954 F.3d at 1041-42;[5] *Medina*, 877 F.3d at 1226; *Boden*, 404 F. Supp. 3d at 1086-91.  *Smith v. OSF*, 933 F.3d 859 (7th Cir. 2019), confirms that the Committee maintains the Saint Peter's Plan.  *Smith* reversed a grant of summary judgment of dismissal on the ground that it was premature in light of plaintiff's demonstrated need for further discovery.  In particular, *Smith* held that further discovery was required on the issue of whether the plan committee in that case

---

Peter's and the Committee are controlled by the church, as the statute requires, means that the ultimate authority over termination rests with the Bishop:

> Yet to constitute a principal-purpose organization, the organization must be "controlled by or associated with a church or a convention or association of churches." Sanzone's definition vitiates the control requirement. Consider an organization that satisfies the provision because it administers a plan and is controlled by a church. That organization might have the ability to adopt, modify, or terminate a plan, but it would still answer to the church for those decisions because the church controls it. The organization would lack the final authority or ultimate responsibility for the plan that Sanzone's definition hinges on.  [citation omitted].

*Sanzone*, 954 F.3d at 1043-44.

[5]     The Eighth Circuit in *Sanzone* reached its decision based on Plaintiff's own allegations in its complaint about the scope of that plan committee's powers, in particular the allegation that the committee had all discretionary powers necessary to carry out the plan.  *Sanzone*, 954 F.3d at 1041.

actually exercised the powers conferred by the plan documents or whether those powers were merely nominal.  *Smith*, 933 F.3d at 869-70.  Here, in contrast, discovery is complete on these issues, and the Committee's minutes show that it meets regularly, hires and oversees delegated third party professionals, and actually exercises its assigned powers of administration, financial evaluation and funding.  The question posed by the Seventh Circuit in *Smith* is answered by the record in this case.

## C.    The Plan Committee Is A Principal Purpose Organization Controlled By The Church

The remaining issue is whether the Plan Committee is an "organization, whether a civil law corporation or otherwise," whose principal purpose is to maintain the Plan and that is controlled by or associated with the Roman Catholic Church.  29 U.S.C. § 1002(33)(C)(i).  It is.

A Principal Purpose Organization need not be a separate legal person from the entity that established a retirement plan.  The plain language of the statute permits it to be "a civil law corporation **or otherwise**." (emphasis added). Relying on dictionary definitions of an "organization" as "a group of people who work together for a shared purpose," *Sanzone*, 954 F.3d 1044, the courts have recognized a committee of the establishing entity as a PPO; *see also Boden*, 404 F. Supp. 3d at 1085 ("an organized body of people with a particular purpose").  Both

30

the express language of the statute and the ordinary meaning of "organization" show that Congress did not require a PPO to be a separate legal entity.

As *Medina* explains, there is simply no reason (other, perhaps, than plaintiffs' desire to narrow the scope of the Exemption) to require a separate corporation:

> If we accept Medina's view of the statute, virtually no plan administered by a benefits committee or similar organization could qualify for the church-plan exemption. Medina would only allow the exemption for wholly independent bodies, constituted with the principal purpose of administering or funding a retirement plan, and endowed with the power to modify or terminate that plan. Medina does not explain this organizational structure would look like. If the principal-purpose organization administering the plan cannot be part of the organization whose employees the plan is intended to benefit, a religiously-affiliated entity would have to create a separate entity just to administer the plan. So, hypothetically, an entity called Religious Healthcare Corp. would have a plan to benefit its employees, but Religious Healthcare Corp. would have to create a separate, self-funded, wholly independent Pension Corp. to administer its plan. What is more, under Medina's theory, Religious Healthcare Corp. could not choose the board of Pension Corp., and Pension Corp. would need the power to terminate Healthcare Corp.'s retirement plan at any time, without needing to consult with Healthcare Corp. There may be some organization out there that is structured like that, but it certainly is not the most intuitive way to do it. And it is not clear what the advantage of such a structure would be, or why Congress would have required it.

> We see no reason to follow Medina and require principal-purpose organizations to be organizations independent of the parent entity, endowed with the power to terminate benefit plans. No authority compels us to bar organizations from constituting subsidiary committees to administer their church plans.

*Medina*, 877 F.3d at 1226.  As *Medina* points out, requiring the creation of a separate, independent corporate entity would make it practically difficult, if not impossible, for a church hospital or school to directly control or associate with the PPO.  In our case, it would be necessary for the Diocese to create a separate Plan Administrator, likewise with the Bishop as its sole member, in order to have a PPO that is independent of Saint Peter's but still controlled by and associated with the Church.  There would be no point to such a structure.

Nor can there be any dispute that the Plan Committee is controlled by the Church and that its principal purpose is to maintain the Plan.  As demonstrated in subpoint A, *supra*, Saint Peter's itself is controlled by and associated with the Diocese of Metuchen.  The Committee is a component of Saint Peter's Board, which is appointed and removable by the Bishop, and the Committee's members are likewise appointed by the Bishop.  (*Stoldt Cert*. ¶ 21, Ex. C, § 1.10.)  The Committee's principal function is to maintain the Plan by administering it and determining the necessary funding.  Accordingly, the Saint Peter's Plan Committee satisfies ERISA's requirement for a principal purpose organization.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court enter partial summary judgment determining that the Saint Peter's Plan satisfies the criteria of 29 U.S.C. § 1002(33)(C)(i) as a church plan exempt from ERISA.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.

By:    *s/ Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM
JAMES HIRSCHHORN
KATHERINE M. LIEB

*Attorneys for Defendants*

Dated:  September 30, 2021

33