<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LAURENCE KAPLAN, *on behalf of himself, individually, and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>SAINT PETER'S HEALTHCARE SYSTEM *et al.*,<br><br>Defendants. | Civil Action No. 13-2941 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

On remand from the U.S. Supreme Court, this matter comes before the Court on twin motions for summary judgment. The first is Plaintiff Laurence Kaplan's ("Kaplan") motion for partial summary judgment (ECF No. 250), which Defendants opposed (ECF No. 262),[1] and Kaplan replied (ECF No. 263). The second is Defendants' own motion for partial summary judgment (ECF No. 253), which Kaplan opposed (ECF No. 260), and Defendants replied (ECF No. 264). The Court held oral argument on the parties' motions on August 10, 2022. The Court has carefully reviewed the parties' submissions and considered the arguments at the August 10 oral argument. For the reasons below, the Court grants Defendants' motion and denies Kaplan's motion.

---

[1] Too numerous to list above the line, Defendants comprise Saint Peter's Healthcare System, Inc. ("Saint Peter's"), Ronald C. Rak, Susan Ballestero, Garrick Stoldt, the Retirement Plan Committee for the Saint Peter's Healthcare System Retirement Plan (the "Committee"), Leslie D. Hirsch, Pamela Teufel, and Lisa Drumbore.

## I.     **BACKGROUND**

What started as a straightforward ERISA action has morphed into a multi-chapter novel of statutory interpretation over what qualifies as a "church plan" under ERISA. In the opening chapter, the Court determined that Saint Peter's did not qualify for the exemption because Saint Peter's established its retirement plan, not the Roman Catholic Church. The Third Circuit agreed with that interpretation. But the Supreme Court did not, focusing instead on the statutory language that zeroed in on which entity maintained a retirement plan. Now nearing what is (hopefully) the end of this journey, the Court grapples with whether the Saint Peter's retirement plan is one "maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is administration or funding of the plan." 29 U.S.C. § 1002(33)(C)(i). To get there, the Court recounts the prior chapters—namely, the Saint Peter's corporate structure, its Retirement Plan Committee, the Supreme Court's recent decision, and finally the parties' motions.

### A.     **The Saint Peter's Corporate Structure**

The Court begins with a review of the Saint Peter's corporate history and structure. Incorporated in 1908 by the Roman Catholic Diocese of Trenton, the entity known as Saint Peter's Healthcare Systems, Inc., is now owned by the Roman Catholic Diocese of Metuchen. (Defs.' Mot. Ex. A (Amended and Restated Certificate of Incorporation), at *9, ECF No. 253-2; Decl. of Garrick Stoldt ¶ 3, ECF No. 253-1.)[2] It is a non-profit healthcare corporation headquartered in New Brunswick, New Jersey. (Stoldt Decl. ¶¶ 3-4; Certificate of Incorporation ¶ 2.) Among Saint Peter's core purposes are "to care, cure, nurture and maintain sick and infirm persons; to own, maintain, operate or assist in the operation of one or more Catholic hospitals and ambulatory, long-term or other healthcare facilities; [and] to furnish or assist in furnishing the public with

---

[2] Pin-cites preceded by asterisks refer to the page number atop the CM/ECF header. The Court cites the section and paragraph numbers of the Saint Peter's corporate documents when possible.

healthcare services." (Certificate of Incorporation ¶ 4.) To those ends, Saint Peter's owns Saint Peter's University Hospital (the "Hospital") in New Brunswick and other healthcare-related subsidiaries. (Stoldt Decl. ¶ 4.) Subsidiaries and all, Saint Peter's employs more than 3,600 healthcare professionals, including doctors and dentists across New Jersey. (Pl.'s Statement of Undisputed Material Facts ("PSUMF") ¶ 2, ECF No. 251.)

Saint Peter's has an indisputably religious bent. Its mission is to "continue the healing ministry of Jesus Christ as expressed in the Gospel." (Defs.' Mot. Ex. B (Amended and Restated Bylaws) art. I, § 2(a), ECF No. 253-3.) To carry out that mission, Saint Peter's has as its sole member the Bishop of the Diocese of Metuchen, who is "responsible for ensuring the compliance" of Saint Peter's with the "Ethical and Religious Directives for Catholic Health Care Facilities." (*Id.* art. III, § 1; Certificate of Incorporation ¶ 9.) Further, prospective board members must agree to manage Saint Peter's "under the purview of and in accord with Roman Catholic philosophy." (Bylaws art. IV, § 3(a).) That includes, for example, adhering to "the belief in the right to life and the inviolability of the human person and the unqualified opposition to abortion." (*Id.*) Notably as well, those serving on Saint Peter's internal investment committee must "select investment managers in accordance with the Catholic Ethical and Religious Directives." (*Id.* art. V, § 9(b).)

Nor does the Saint Peter's religious mission rest on beliefs alone: the Roman Catholic Church exercises significant control over it. The Saint Peter's bylaws vest the Bishop of the Diocese of Metuchen with virtually unfettered discretion over all its corporate affairs. (*See id.* art. III, § 2.) Among the Bishop's powers are the ability to appoint and remove Saint Peter's board members; to appoint and remove the Chair, Chief Executive Officer, and Treasurer; to control Saint Peter's subsidiaries; and to veto any action by Saint Peter's or its board. (*Id.*; *see also id.* art. IV, § 2 (detailing the Bishop's control over board elections).) By designation, the Bishop also

automatically has a vote in each of the board's committees, including the Retirement Plan Committee. (Bylaws art. V, § 1 ("[T]he Member's Representative shall be a member of all committees ex officio with vote.").)[3]

**B.      The Saint Peter's Plan and Retirement Plan Committee**

That Committee lies at the heart of this dispute. Mandated by the Saint Peter's bylaws, the Committee has nine duties (which the Court lists in full given their primacy in this dispute):

(1)      Possess overall responsibility for the oversight of the retirement plans sponsored by the Corporation;

(2)      Oversee the management of plan assets relating to the defined benefits pension and other retirement and savings plans maintained by the Corporation;

(3)      Review the Corporation's policy for funding its retirement plans;

(4)      Receive and review periodic reports on the administration and operation of the Corporation's retirement plans to ensure the achievement of their intended purposes;

(5)      Act on behalf of the Board with respect to the appointment and termination of Governors, third party administrators, investment managers, named fiduciaries or other positions relating to the retirement plans;

(6)      Approve on behalf of the Board any amendment to the Corporation's retirement plans or do any other task with respect to the retirement plans that requires action by the Board;

(7)      Receive periodic briefings regarding compliance with funding and other regulatory requirements, including the Employee Retirement Income Security Act of 1974, as amended;

(8)      Review periodically the performance of any third parties engaged in the administration, management or investment of funds of any Corporation retirement plan, and to review the recommendations of management with respect to the engagement or termination of any third parties; and

(9)      Perform any and all other functions and take any and all other actions as may be directed by the Board from time to time.

---

[3] The Member's Representative is the Episcopal Vicar for the Healthcare Apostolate of the Diocese of Metuchen. (*Id.* art. IV, § 2.)

(*Id.* art. V, § 13(b).) In line with these duties, Saint Peter's amended its retirement plan to the Saint Peter's Healthcare Retirement Plan (the "Plan") in 2010. (Defs.' Mot. Ex. C (Governing Plan Document), at 1, ECF No. 253-4.) It again amended the Plan in 2012 to a "defined contribution plan." (Stoldt Decl. ¶ 14.)[4] The Plan was not the first that Saint Peter's offered its employees. According to Kaplan, Saint Peter's offered its employees an ERISA-compliant "defined benefits plan" from 1974 until at least 2006. (PSUMF ¶ 7.)[5]

So why amend to the new plan? Kaplan contends that Saint Peter's learned that it could qualify under the "church plan" exemption of ERISA in 2006—presumably meaning it would qualify for better tax treatment. (*See* PSUMF ¶ 8; *id.* Ex. 24 (Oct. 6, 2006 Letter), ECF No. 252-

---

[4] The Third Circuit recently described the differences between a "defined contribution plan" and a "defined benefit plan":

> ERISA covers two types of retirement plans: defined benefit plans and defined contribution plans. A defined benefit plan "generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation." The promised payments are made to participants from the plan's "general pool of assets." A defined contribution plan, in contrast, "promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." In a defined contribution plan, "all of the plan's money is allocable to plan participants," and the "vested benefits are the contents of [each participant's] account: contributions (from both the participant and employer) plus investment gains minus investment losses and any allocable expenses."

*Boley v. Univ. Health Servs., Inc.*, 36 F.4th 124, 128 n.2 (3d Cir. 2022) (alteration in original) (internal citations omitted).

[5] The Court recognizes that Defendants dispute this paragraph of Kaplan's Statement of Undisputed Material Facts. Rather than accede to Kaplan's characterization of the first plan, Defendants contend that they operated the first plan like an ERISA-compliant plan and that they chose not to elect an ERISA exemption under prevailing tax regulations. (Defs.' Resp. to PSUMF ¶ 7, ECF No. 262-3.) In other words, a distinction without a difference. (*See* Aug. 10, 2022 Oral Arg. Tr. 15:23-24, ECF No. 274 ("What is clear is that we both agree after discovery that there aren't any disputed issues of material fact.").) The Court relies on the characterization of the first plan in paragraph seven of Plaintiff's Statement of Undisputed Material Facts.

21.)[6] More to the point, in 2006, Saint Peter's informed the IRS that it could qualify for the ERISA exemption because "the responsibility for the administration of the Plan has been delegated to the Committee" and because Saint Peter's "controls the Committee through its power of appointment and removal over Committee members." (PSUMF ¶ 8 (quoting Oct. 6, 2006 Letter, at *7, *9).) Following the Saint Peter's reorganization of the Plan to a defined contribution plan, the IRS issued a ruling in 2013 that qualified the Plan as a church plan. (*See* Defs.' Mot. Ex. D (Aug. 14, 2013 IRS Letter), at 5, ECF No. 253-5.)

Whatever the case, the record bears out that the Committee retained substantial control over the Plan. Section 8.01 of the governing Plan document describes the Committee as the "Plan Administrator." (Governing Plan Doc. art. 8, § 8.01.) The governing document grants the Committee with "exclusive discretionary authority and power to determine eligibility for benefits and to construe the terms and provisions of the Plan." (*Id.* art. VIII, § 8.02.) It further provides that the Committee shall have discretion to "determine questions of fact and law arising under the Plan, direct disbursements pursuant to the Plan, and exercise all other powers" expressly or implicitly provided for in the governing document. (*Id.*) The Committee may also delegate those powers. (*Id.* art. VIII, § 8.03.) And though the governing document provides that Saint Peter's may amend and terminate the plan, the Saint Peter's bylaws clarify that the Committee must first approve any major change to the Plan. (*Compare id.* art. IX, §§ 9.01-.02, *with*, *e.g.*, Bylaws art. V, § 13(b)(6) (vesting Committee with authority to "[a]pprove on behalf of the Board any amendment to the Corporation's retirement plans or do any other task with respect to the retirement plans that

---

[6] Sponsors of ERISA-exempt plans also do not need to pay premiums to the Public Benefit Guaranty Corporation. *See* 29 U.S.C. §§ 1306-07. The Committee's meeting minutes show that those premiums totaled somewhere between $300,000 and $400,000 a year. (PSUMF Ex. 12 (Nov. 17, 2010 Committee Minutes), at *9, ECF No. 252-9.)

requires action by the Board"). *See also* Stoldt Decl. ¶ 32 ("The Plan contemplates the amendment of the Plan by the Corporation, which duty is delegated to the Plan Committee pursuant to the Bylaws.").)

The Committee's meeting minutes reveal the Committee's control over all things concerning the Plan. A sampling:

- Discussing, voting, and approving amendments to the Plan (*see* PSUMF Ex. 9 (Mar. 17, 2010 Committee Minutes), at *11-13, ECF No. 252-6; *id.* Ex. 10 (May 26, 2010 Committee Minutes), at *9, ECF No. 252-7);

- Holding a special meeting to select a vendor for the Plan (*see* PSUMF Ex. 11 (July 8, 2010 Committee Minutes), at *4-9, ECF No. 252-8);

- Discussing, voting, and approving a restatement of the terms of the Plan (*see* Nov. 17, 2010 Committee Minutes, at *8-9);

- Reviewing investment performance and employee participation in the Plan (*see* PSUMF Ex. 13 (Feb. 16, 2011 Committee Minutes), at *11-12, ECF No. 252-10);

- Discussing, voting, and approving "ERISA-[l]ike protections" and "additional prospective defined contribution plan benefits" for the Plan (*see* PSUMF Ex. 18 (Feb. 23, 2012 Committee Minutes), at *11, ECF No. 252-15); and

- Reviewing the Plan's vendor's fees and investment options (*see* PSUMF Ex. 17 (*see* Feb. 25, 2015 Committee Minutes), at *10, ECF No. 252-14).

On top of that, the minutes also show that the Committee was concerned with the Plan's investment managers adhering to Catholic principles. For instance, Committee members often discussed Plan members following the "United States Conference of Catholic Bishops Socially Responsible Investment Guidelines." (*E.g.*, Nov. 17, 2010 Committee Minutes, at *9; PSUMF Ex. 15 (May 31, 2012 Committee Minutes), at *9, ECF No. 252-12 ("[Mr. Stoldt] also addressed the Investment Guidelines of the Catholic Bishops, which we should stay in compliance with.").) In another example, the Committee approved an amendment to the Plan to increase the amount of a survivor

annuity, which the minutes describe as "more in line with Catholic values." (Mar. 17, 2010 Committee Minutes, at *11.)

That is not to say that Saint Peter's exercises no control over the Plan, however. As the Plan's sponsor, Saint Peter's contributes to and funds the Plan. (Governing Plan Doc. art. 3, § 3.01; art. 5, § 5.11.) Once the Committee sets an annual funding goal for the Plan, Saint Peter's meets that goal by transferring money from the Hospital to the Plan. (PSUMF ¶ 17.) Saint Peter's—through its board—also approves any major amendments to the Plan. (Stoldt Decl. ¶ 35; Governing Plan Doc. art. 9, § 9.01.) According to Defendants, board approval is often necessary because Plan amendments "typically require Saint Peter's to take additional action unrelated to the Plan." (Stoldt Decl. ¶ 36.) Indeed, the board has voted on several amendments to the Plan, including freezing it for new employees and administering the Plan as an ERISA-exempt "church plan." (PSUMF ¶¶ 19-20; Pl.'s Mot. Ex. 1 (Stoldt Rule 30(b)(6) Dep. Tr.), at 84:6-85:7, 149:23-150:17, ECF No. 251-2.)

The governing Plan document also notes that Saint Peter's maintains the Plan. More on why that's significant later. Suffice it to say, the governing document described Saint Peter's as the entity maintaining the plan. For example, in the Definitions section, the governing document defines "System or Employer" as "Saint Peter's Healthcare System (or its predecessor that *maintained* the Plan)." (Governing Plan Doc. art. 1, § 1.40 (emphasis added).) The document also details that Saint Peter's "intends to *maintain* the Plan as a permanent tax-qualified retirement plan." (*Id.* art. 9, § 9.02 (emphasis added); *see also id.* art. 11, § 11.02(c) (flush language) (describing a "top-heavy ratio" and conditioning ratio on whether Saint Peter's "maintains one or more defined benefit plans").)

8

C.     The Supreme Court's Decision in *Advocate Health Care Network v. Stapleton*

This matter is not the first time this Court has considered the Plan and its religious ERISA

exemption. Both this Court and the Third Circuit ruled that the Plan did not qualify for the ERISA

exemption because a church did not establish the Plan. *Kaplan v. Saint Peter's Healthcare Sys.*,

No. 13-2941, 2014 WL 1284854, at *5 (D.N.J. Mar. 31, 2014), *aff'd*, 810 F.3d 175 (3d Cir. 2015).

Two other circuits joined the Third Circuit in requiring that a church establish an employee benefits

plan to qualify for the ERISA exemption. *See Stapleton v. Advoc. Health Care Network*, 817 F.3d

517, 521-27 (7th Cir. 2016); *Rollins v. Dignity Health*, 830 F.3d 900, 905-06 (9th Cir. 2016).

But the Supreme Court saw it differently. In *Advocate Health Care Network v. Stapleton*,

the Supreme Court reversed the Third, Seventh, and Ninth Circuits' reading of the ERISA

exemption. 581 U.S. 468, 484 (2017). Like the circuits, it started with the relevant statutory text,

focusing on the interplay between two provisions of ERISA's definition of a "church plan":

> Under paragraph (A), a "'church plan' means a plan established and
> maintained . . . by a church."
>
> Under subparagraph (C)(i), "[a] plan established and maintained . . . by a
> church . . . includes a plan maintained by [a principal-purpose] organization."

*Id.* at 475 (alterations in original) (quoting 29 U.S.C. § 1002(33)(A), (C)(i)). But unlike the circuits,

the Supreme Court did not read these provisions as requiring that a church establish a plan. Rather,

it zeroed in on the word "includes" in subparagraph (C)(i). *Id.* at 476. For the Court, Congress's

unambiguous inclusion of plans maintained by a principal-purpose organization "tells readers that

a *different* type of plan should receive the same treatment (i.e., an exemption)." *Id.* Put differently,

the Supreme Court reasoned that subparagraph (C)(i) modified paragraph (A)'s definition of a

church plan to mean a plan that is maintained by a principal-purpose organization. That newer

definition mentions nothing about a church establishing a plan; "[t]he church-establishment

condition . . . drops out of the picture." *Id.*

The Supreme Court added that the canon against surplusage militated in favor of this statutory reading. For the Court, Congress could have clarified that subparagraph (C)(i) altered plans maintained by churches only just by omitting the words "established and" from the subparagraph's text. "Had Congress wanted, as the employees contend, to alter only the maintenance requirement, it had an easy way to do so—differing by only two words from the language it chose, but with an altogether different meaning." *Id.* at 477. Indeed, Congress could have meant subparagraph (C)(i) to apply to maintained plans only. But "[i]nstead, it added language whose most natural reading is to enable a plan 'maintained' by a principal-purpose organization to substitute for a plan both 'established' and 'maintained' by a church." *Id.* So the Court had to give meaning to the words "established and." And the only natural reading for the Court was Congress's intent to redefine the establishment requirement out of the church-plan exemption altogether. *Id.* (citing *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)).

Nor was the Supreme Court troubled by its construction that conflated establishing a plan with maintaining it. "ERISA treats the terms 'establish' and 'maintain' interchangeably." *Id.* at 480 (citing 29 U.S.C. § 1002(16)(B) as "defining the 'sponsor' of a plan as the organization that 'establishe[s] or maintain[s]' the plan" (alterations in original)). And the Court diminished the significance of the "one-time, historical event" of establishing a plan, reasoning that "it is the entity *maintaining* the plan that has the primary ongoing responsibility (and potential liability) to plan participants." *Id.* (citing, *e.g.*, *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 920 (2d Cir. 1987)). The Court thus affirmed that the gap between establishment and maintenance was not a large one: "[t]he former serves as a necessary precondition of the latter, and both describe an aspect of an entity's involvement with a benefit plan." *Id.*

The upshot from *Stapleton* is that the inquiry is no longer whether a church formally established a retirement plan. The Supreme Court made that much clear by walking through ERISA's nebulous legislative history. *See id.* at 481-82 (favorably citing legislative history showing that Congress "designed the [church-plan exemption] to ensure that, however categorized, all groups associated with church activities would receive comparable treatment" (citation omitted)). Instead, district courts must focus on the definition in subparagraph (C)(i)—whether the plan is maintained by a principal-purpose organization. 29 U.S.C. § 1002(33)(C)(i); *Stapleton*, 581 U.S. at 483-84 ("Under the best reading of the statute, a plan maintained by a principal-purpose organization therefore qualifies as a 'church plan,' regardless of who established it.").[7]

**D.      The Parties' Motions for Partial Summary Judgment**

The parties home in on *Stapleton*'s new test. Although the parties filed dueling motions, their arguments boil down to the same question: Does the Plan qualify as an exempt church plan under ERISA? Kaplan contends that the answer is no. He argues that Saint Peter's maintains the Plan and that because Saint Peter's is neither a church nor a principal-purpose organization, the Plan cannot qualify. (Pl.'s Moving Br. 19-24, ECF No. 250-1.) He urges that the Court define "maintain" to mean "continue." (*Id.* at 20.) According to Kaplan, that definition comports "with the use of 'maintain' in ERISA to mean the sponsor's decision to keep the plan in existence . . . because only the plan sponsor has the power to amend and terminate the plan." (*Id.*) He buttresses that argument by pinpointing provisions in the Saint Peter's governing documents that imbue Saint Peter's (not the Committee) with the power to amend and terminate the Plan. (*Id.* at 21-24.)

---

[7] The Supreme Court declined to weigh in on what qualifies as a principal-purpose organization. *Stapleton*, 581 U.S. at 475 n.3.

Kaplan also contends that just as Saint Peter's maintains the Plan, so too does the Committee not maintain it. (*Id.* at 25-33.) As Kaplan sees it, the Committee *administers* the Plan. (*Id.* at 25-26.) That's a non-starter for an ERISA exemption because "[b]oth case law and the text of ERISA confirm that 'maintained' and 'administer' have distinct meanings." (*Id.* at 26 (citing 29 U.S.C. § 1002(16)).) Kaplan shores up that position by citing several cases—albeit pre-*Stapleton* cases—that show that courts often treat the plan sponsor as the entity that maintains a retirement plan. (*See id.* at 27-29 (citing, *e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996), for proposition that entities that establish or maintain plans are those that "adopt, modify, or terminate" plans, similar to "settlors of a trust").) In a similar vein, at oral argument, counsel for Kaplan relied on *Rose*, 828 F.2d at 918-21, to bolster his argument that interpreting the term "maintain" to mean "administer" would create unintended consequences because "maintain" is a common term throughout the ERISA statute. (*See* Aug. 10, 2022 Oral Arg. Tr. 7:5-12.)[8]

Defendants reject all of this. They contend that the Court should apply the three-step framework employed by the Tenth Circuit to conclude that (1) Saint Peter's is an organization associated with the Roman Catholic Church, (2) the Committee is a principal-purpose organization that maintains the Plan, and (3) the Committee is associated with the Roman Catholic Church. (*See generally* Defs.' Moving Br. 18-32, ECF No. 253-17.) To those ends, Defendants argue that the Saint Peter's governing documents and the IRS view the corporation as an entity within the Roman Catholic Church. (*Id.* at 24-26.) And they contend that the Court should follow the lead of several circuits in holding that the Committee maintains the Plan as a principal-purpose organization. (*Id.* at 26-30.) Indeed, in opposing Kaplan's summary-judgment motion, Defendants concede that

---

[8] As a parting shot, Kaplan argues that even if the Committee maintains the Plan, it is not a principal-purpose organization. (Pl.'s Moving Br. 34-35.)

Saint Peter's maintains the Plan; that concession is irrelevant, however, according to Defendants, because both Saint Peter's and the Committee can maintain the Plan under ERISA. (Defs.' Resp. Br. to Pl.'s Mot. 11-12, ECF No. 262.) Finally, Defendants urge that, like Saint Peter's, the Committee must also be an organization associated with the Roman Catholic Church because the church-plan exemption defines organizations broadly. (*See* Defs.' Moving Br. 30-32.)

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure provide that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*,

912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.   **DISCUSSION**

The Court must determine whether the Plan qualifies as a church plan under ERISA. Following *Stapleton*, the Court focuses not on what entity established the Plan but whether an entity maintains the Plan as a principal-purpose organization. That focus arises from the statutory definition of a church plan, a religiously exempt plan under ERISA:

> a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(C)(i). Neither the Supreme Court nor the Third Circuit have yet commented on these statutory terms. Nor does ERISA define these terms—"maintain," "principal purpose,"

and "organization" for starters—leaving the Court to its own interpretative journey for this novel question.

But it is not without guideposts on that journey. Three other circuits have provided helpful authority on what constitutes a church plan.[9] The most illuminating is the Tenth Circuit's decision in *Medina*. There, an employee (Medina) sued her employer Catholic Health Initiatives ("CHI") for offering a non-compliant retirement plan under ERISA. *Medina*, 877 F.3d at 1220. She argued (like Kaplan here) that CHI's plan was not a church plan because it was not maintained by a principal-purpose organization associated with a church. *Id.* The Tenth Circuit disagreed, affirming the district court's grant of summary judgment for CHI. *Id.*

To get there, the court laid out a three-part test to assess whether an employee benefit plan qualified for the church-plan exemption under 29 U.S.C. § 1002(33)(C)(i):

1.  Is the entity a tax-exempt nonprofit organization associated with a church?

2.  If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?

3.  If so, is that principal-purpose organization itself associated with a church?

*Id.* at 1222. Only if the answer to all three questions is yes will the plan qualify. *Id.* The court grounded that test in the statutory text of the church-plan exemption and the Supreme Court's ruling in *Stapleton*. It noted for example that the first prong flows from the exemption's reference to "employees of a church," which in turn demands "employees of tax-exempt organizations 'controlled by or associated with a church.'" *Id.* (quoting 29 U.S.C. § 1002(33)(C)(ii)(II)). The second prong restates the Supreme Court's ruling in *Stapleton*. *See id.* at 1221. And the third prong

---

[9] *Medina v. Cath. Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017); *Smith v. OSF HealthCare Sys.*, 933 F.3d 859 (7th Cir. 2019); *Sanzone v. Mercy Health*, 954 F.3d 1031 (8th Cir. 2020).

lies in the exemption's command that the "[principal-purpose] organization [be] controlled by or associated with a church." *Id.* (quoting 29 U.S.C. § 1002(33)(C)(i)).

Applying the test, the Tenth Circuit first considered whether CHI was associated with the Roman Catholic Church. *Id.* at 1222-24. It was. The court reasoned that "CHI is listed in The Official Catholic Directory" and that "the IRS considers any organization listed in The Official Catholic Directory 'associated with' the Roman Catholic Church for purposes of ERISA's church-plan exemption." *Id.* at 1223 (citation omitted). Further, the court looked to CHI's governing documents to note its religious purposes and that several personnel from a "canon-law public juridic person" served as CHI's trustees. *Id.* The court thus comfortably concluded that CHI was associated with the Roman Catholic Church.

Turning to the second prong, the Tenth Circuit analyzed the meaning of "maintain" and "organization." *Id.* at 1224-27. Medina contended that the entity that maintained CHI's plan was the one that had the power to amend and terminate the plan. *Id.* at 1224-25. Rejecting that definition, the court relied on dictionaries to reason that "maintain" meant (among other definitions) to "care for (property) for purposes of operational productivity." *Id.* at 1225 (quoting *Maintain*, *Black's Law Dictionary* (9th ed. 2009)). It also looked to federal law for other examples of the word "maintain"—deducing that ERISA's requirement that employers "maintain records with respect to each of [their] employees" did not command the employers to amend and terminate those records. *Id.* (quoting 29 U.S.C. § 1059(a)(1)). The court thus found the dictionary's definition more authoritative than Medina's construction. *Id.* at 1225-26. And because the CHI plan documents "expressly delegate[d] the power to 'maintain'" to a CHI subcommittee, the court concluded that the subcommittee maintained the plan. *Id.* at 1226.

Nor did the court accept Medina's argument that the subcommittee was not an "organization" under ERISA. *Id. Black's* again broadly defined an organization as "[a] body of persons (such as a union or a corporation) formed for a common purpose." *Id.* (alteration in original) (quoting *Organization, Black's Law Dictionary* (9th ed. 2009)). *Webster's* similarly defined organizations to include "a group of people that has a more or less constant membership, a body of officers, a purpose, and usu[ally] a set of regulations." *Id.* (alteration in original) (quoting *Organization, Webster's Third New International Dictionary* (2002)). The court concluded that the subcommittee fell into these definitions because its charter described a common purpose, a body of officers, and several regulations. *Id.*

As to the final prong, the Tenth Circuit determined that any subdivision of an employer associated with the Roman Catholic Church must—"as a matter of logic"—also be associated with the Roman Catholic Church. *Id.* at 1227. Further, any doubts about that logic were defeated by the plain language of the plan documents. As the court noted, those documents revealed that the subcommittee had a religious purpose and "share[d] common religious bonds with the Roman Catholic Church and the Sponsoring Congregations of the Catholic Health Initiatives." *Id.* (citation omitted). In sum, the Tenth Circuit rounded out its analysis by concluding that CHI's plan was an exempt church plan under ERISA. *Id.* at 1229-30.

The Court does not rehash the thorough analysis of the Tenth Circuit for mere illustration. It does so to show that the Tenth Circuit's threefold framework makes sense in resolving this dispute. For one, the test grows from the unambiguous text of the church-plan exemption in ERISA and the Supreme Court's ruling in *Stapleton*. That comports with this Circuit's guidance, commanding that "it is rarely necessary to inquire further into [a] statute's meaning" when "the statutory language is plain and unambiguous." *Marmon Coal Co. v. Dir., Off. of Workers' Comp.*

*Program*, 726 F.3d 387, 392 (3d Cir. 2013) (citation omitted). Indeed, by focusing on the text of ERISA itself, the Tenth Circuit's framework avoids introducing ambiguities to the otherwise plain text that may be lurking in the legislative history and the statute's expansive remedial purpose. Of note, the Supreme Court eschewed an approach that relied on ERISA's history, which it described as "almost wholly of excerpts from committee hearings and scattered floor statements by individual lawmakers—the sort of stuff we have called 'among the least illuminating forms of legislative history.'" *Stapleton*, 581 U.S. at 481 (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017)). It instead endorsed a straightforward textual reading of the church-plan exemption. *See id.* at 475-78. The Tenth Circuit's approach in *Medina* fits with that reading.

The approach is also easy to apply. The step-by-step analysis stops the Court from saying too much if, say, a retirement plan's sponsor is not associated with a church in the first place. Once the Court strikes a "no" on any of the questions, the analysis stops. Further, the approach works especially well at the summary-judgment stage, as the Court has ample documents at its disposal to answer the three questions posed by the Tenth Circuit. Just as the Tenth Circuit relied on the governing documents of CHI, CHI's subcommittee, and CHI's plan, so too can the Court rely on the corporate documents of Saint Peter's and its Plan. The Court thus relies on the framework set out by the Tenth Circuit in *Medina* to answer whether Saint Peter's qualifies as a church plan under ERISA.

Nor is the Court the first to do so. In *Boden v. St. Elizabeth Medical Center, Inc.*, a case almost identical to the one here, the Eastern District of Kentucky adopted the Tenth Circuit's approach on cross-motions for summary judgment. 404 F. Supp. 3d 1076, 1082 & n.2 (E.D. Ky. 2019) (noting that the "dearth of Sixth Circuit case law regarding the church-plan exemption" compelled the district court to "look[] to the few relevant cases from other districts and circuits");

see also *Casto v. Unum Life Ins. Co. of Am.*, 508 F. Supp. 3d 243, 246 (E.D. Tenn. 2020) (adopting *Medina* test as "squar[ing] with the plain text of ERISA and the Court's holding in *Stapleton*"). And in *Rollins v. Dignity Health*, another case with similar facts, the Northern District of California adopted the *Medina* framework to assess a religious employer's motion to dismiss. 338 F. Supp. 3d 1025, 1035 (N.D. Cal. 2018). Finally, though it did not formally adopt the test, the Eighth Circuit has cited *Medina* favorably in assessing an ERISA appeal from a motion to dismiss—especially as to whether a corporate committee is an "organization" that "maintains" a plan. *Sanzone*, 954 F.3d at 1041-45.[10] The Court thus proceeds to the first prong under *Medina*.

### A.   Is Saint Peter's a Tax-Exempt Nonprofit Organization Associated with the Roman Catholic Church?

The Court first considers whether Saint Peter's is a tax-exempt nonprofit organization associated with the Roman Catholic Church. No question exists that Saint Peter's is a tax-exempt nonprofit organization. Its Certificate of Incorporation establishes it under Title 15A of the New Jersey Code (the New Jersey Nonprofit Corporation Act) and qualifies it under section 501(c)(3) of the Internal Revenue Code. (Certificate of Incorporation ¶¶ 5, 7; *see also* Pl.'s Resp. to Defs.' SUMF ("DSUMF") ¶¶ 1, 19, ECF No. 261 ("agree[ing] that Saint Peter's Healthcare System . . . is a nonprofit healthcare system" and that Saint Peter's "receives a blanket federal income tax exemption").)

The only real question then is whether Saint Peter's is associated with the Roman Catholic Church. For that, the Court turns to the plain text of ERISA. The statute reads that an organization

---

[10] That is not to say that *Sanzone* rejected the *Medina* framework. To the contrary, the Eighth Circuit cabined its analysis to the second prong under *Medina* because the appellant did not contest the first or third prongs. *See Sanzone*, 954 F.3d at 1040 ("Because Sanzone does not contest that the Committee's primary purpose is administering the [p]lan and that it is associated with the Catholic church, the parties' arguments focus on whether the Committee (a) maintains the [p]lan and (b) constitutes an organization.").

"is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv). Saint Peter's meets this statutory definition.

Start with the history of Saint Peter's. The Roman Catholic Diocese of Trenton founded the corporation in 1908 and transferred ownership to the Roman Catholic Diocese of Metuchen in 1981. (Stoldt Decl. ¶ 3.) As a part of the Diocese of Metuchen, Saint Peter's is a "public juridic person under the canon law of the Roman Catholic Church." (*Id.*) A public juridic person is the "canon-law equivalent of a corporation." *Medina*, 877 F.3d at 1222. Canon law defines it as an aggregate of persons or things "constituted by competent ecclesiastical authority so that, within the purposes set out for them, they fulfill in the name of the Church, according to the norm of the prescripts of the law, the proper function entrusted to them in view of the public good." 1983 Code c.116, § 1. In other words, though the New Jersey Nonprofit Corporation Act governs Saint Peter's corporate affairs, canon law compels the corporation to function on behalf of the Roman Catholic Church. *See Medina v. Cath. Health Initiatives*, 147 F. Supp. 3d 1190, 1195 (D. Colo. 2015) ("Public juridic persons are the official constitutive parts of the Catholic Church and the primary means through which the Church acts in the world." (citation omitted)).

Saint Peter's is also listed in The Official Catholic Directory. (DSUMF ¶ 12.) "An entity is listed in the directory only if a bishop of the Roman Catholic Church determines the entity is 'operated, supervised, or controlled by or in connection with the Roman Catholic Church.'" *Overall v. Ascension*, 23 F. Supp. 3d 816, 831 (E.D. Mich. 2014) (citation omitted). Indeed, as at least one court has described, the directory "is the definitive compilation of Roman Catholic institutions in the United States." *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 202-03 (D. Conn. 2000). And it's not just courts that have found the directory listing dispositive of an

entity's association with the Roman Catholic Church: the IRS has too. The IRS deems "[a]ny" entity listed in the directory to be "associated with" the Roman Catholic Church under ERISA's church-plan exemption. I.R.S. Gen. Couns. Mem. 39,007, 1983 WL 197946, at *4 (July 1, 1983).

So, the Court gleans that the Roman Catholic Church views Saint Peter's as one of its own. The feeling is mutual. The Saint Peter's bylaws note that the corporation's mission is to "continue the healing ministry of Jesus Christ as expressed in the Gospel." (Bylaws art. I, § 2(a).) The bylaws also vest near-absolute authority in its sole member, the Bishop of the Diocese of Metuchen, to (among other powers) appoint the management and board members of Saint Peter's. (*Id.* art. III, § 2; *see Boden*, 404 F. Supp. 3d at 1083 (finding Bishop's control over management and board as "indicat[ing] clear association with the Catholic Church"). The Bishop may also veto any action by the Saint Peter's board. (Bylaws art. III, § 2(e).) Nor is the board free from control by the Roman Catholic Church. Board members must agree to manage Saint Peter's "under the purview of and in accord with Roman Catholic philosophy," including by adopting the Roman Catholic Church's "unqualified opposition to abortion." (*Id.* art. IV, § 3(a).) The undisputed evidence establishes that Saint Peter's bears a remarkably close relationship with the Roman Catholic Church. Because it does, Saint Peter's "shares common religious bonds and convictions with" the Roman Catholic Church. 29 U.S.C. § 1002(33)(C)(iv).

## B.    The Committee Is a Principal-Purpose Organization that Maintains the Plan.

The church-plan exemption demands "a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of" a retirement plan. 29 U.S.C. § 1002(33)(C)(i). The parties dispute which entity— Saint Peter's or the Committee—maintains the Plan. And Kaplan alternatively argues that even if the Committee maintains the Plan, the Committee is not an organization under the church-plan exemption. The Court considers each argument in turn.

### 1.   Maintain

Congress did not define the term "maintain" despite that term's prevalence throughout ERISA. As such, the Court's "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Whenever possible, the Court must follow "the basic and unexceptional rule" to "give effect to the clear meaning of statutes as written." *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (citation omitted). And in examining statutory language, the Court "begins and ends its inquiry with the text, giving each word its 'ordinary, contemporary, common meaning.'" *Id.* (cleaned up) (quoting *Walters v. Metro. Ed. Enters., Inc.*, 519 U.S. 202, 207 (1997)). The Court does not, however, interpret statutory language in a vacuum. Instead, it considers the words of a statute "in their context and with a view to their place in the overall statutory scheme." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019) (citation omitted).

Congress enacted ERISA in 1974 and amended the church-plan exemption in 1980. *Sanzone*, 954 F.3d at 1041. As other courts have done, the Court looks to contemporaneous dictionaries at the time of ERISA's 1980 amendment. *Id.*; *see also Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 647 F.3d 506, 511 (3d Cir. 2011) ("We refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words." (citation omitted)). The *Oxford English Dictionary*—considered by the Supreme Court to be "one of the most authoritative on the English language," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012)—defined "maintain" in 1989 to mean (as most relevant here) "[t]o keep up, preserve, cause to continue in being" and "[t]o preserve in existence." *Maintain*, *Oxford English Dictionary* (2d ed. 1989). Another dictionary provides a similar definition: "[t]o support;

to keep in condition; to sustain." *Maintain*, *Ballantine's Law Dictionary* (3d ed. 1969). Using these definitions, the Court assesses whether the Committee supported, preserved, or sustained the Plan.

It did. The undisputed evidence provides several examples of how the Committee sustained and preserved the Plan. The Saint Peter's bylaws, for instance, provide that the Committee has "overall responsibility for the oversight" of the Plan. (Bylaws art. V, § 13(b)(1); *see Boden*, 404 F. Supp. 3d at 1087 ("[I]n determining whether an organization is the one 'maintaining' a plan, courts look to the documents governing the pension plans for guidance and focus on the responsibilities designated to the organization rather than the day-to-day functions of the organization.").) The only sensible reading of that broad command is that the Committee is responsible for sustaining the Plan and continuing its existence. Surely the Committee would be shirking its mandated duty if, say, the Plan were woefully underfunded or if Plan claimants went uncompensated. That common-sense inference explains why the Saint Peter's bylaws vest the Committee with several other responsibilities, such as reviewing periodic reports on the Plan, appointing investment managers for it, and amending it. (Bylaws art. V, § 13(b); *see Sanzone*, 954 F.3d at 1041 (concluding that a complaint alleged that a corporate committee maintained a retirement plan because "the powers referred to in the complaint include interpreting and applying the [p]lan, the monitoring of fiduciaries, and all powers necessary to carry out the [p]lan").) And notably, the governing Plan document vests final authority in the Committee—not Saint Peter's— for employees claiming unreceived benefits. (Governing Plan Doc. art. 12, § 12.05; *see Boden*, 404 F. Supp. 3d at 1089 (finding "claims administration (including appeals)" as evidence of maintenance by corporate committee).)

The bylaws further specify that the Committee oversees the Plan's assets and investments. (Bylaws art. V, § 13(b)(2).) That's critical because the Plan is a defined contribution plan, which

relies on its investment portfolio to sustain itself. "A defined contribution plan . . . 'promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account *and the investment performance of those contributions.*'" *Boley*, 36 F.4th at 128 n.2 (emphasis added) (quoting *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 n.1 (2008)). In other words, the assets matter for the very existence of the Plan. The Committee recognized this concern time and time again as its meeting minutes reflect its deliberation over the proper investment managers for the Plan, the investment portfolio of the Plan, and the Catholic virtue of the Plan's investments. It also routinely heard from actuaries to determine the annual amount of funding for the Plan. (Stoldt Decl. ¶ 43 ("The Plan Committee determines an annual amount of funding at its third meeting of each year. The actuaries provide a recommended funding contribution, which is reviewed and discussed by the Plan Committee.").) To say then (as Kaplan does) that the Committee played no role in maintaining the Plan skirts the meeting-by-meeting account of the Committee's careful deliberations.

Kaplan resists this conclusion and instead proffers that an entity maintains a retirement plan when it funds the plan and has the power to amend and terminate it. (Pl.'s Moving Br. 20-24.) And for Kaplan, the only entity with those functions is Saint Peter's, not the Committee. (*Id.*) The Court agrees that those functions are part of supporting, preserving, and sustaining a retirement plan. It disagrees that those are the exclusive actions necessary for a plan's maintenance. To support his reading, Kaplan points to a definition of "maintain" in the most recent edition of *Black's Law Dictionary*, which defines the term to mean "continue (something)." (*Id.* at 20-21.) But the Court does not look to the most recent dictionaries for meaning because Congress amended the church-plan exemption in 1980. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a fundamental canon of statutory construction that words generally should be interpreted as

taking their ordinary meaning at the time Congress enacted the statute." (cleaned up) (quoting *Wis. Cent. Ltd.*, 139 S. Ct. at 2074)). Nor does Kaplan put much stock in his dictionary definition because at oral argument his counsel told the Court that the answer to what "maintain" means "can't be found in dictionaries." (Oral Arg. Tr. 10:4-6.) And even if the Court accepted Kaplan's preferred definition, the undisputed evidence shows that the Committee continued the Plan by (among other actions) setting annual funding goals, overseeing its investment performance, and adjudicating benefits claims. *See Stapleton*, 581 U.S. at 480 (noting that an entity maintains a plan when it has "primary ongoing responsibility" for the plan).[11] All told, the Court agrees with Kaplan that Saint Peter's maintains the Plan. But so does the Committee.

Hold on, says Kaplan. By adopting that broad interpretation of "maintain," the Court may end up conflating that term with "administer," another undefined term in ERISA. That's a problem, according to Kaplan, because "ERISA uses the terms 'maintain' and 'administer' to refer to two distinct functions." (Pl.'s Moving Br. 26.) The Court again agrees with Kaplan's premise but disagrees with his conclusion. The term "administer" means something different from "maintain"; the *Oxford English Dictionary*, for example, defines "administer" to mean "[t]o manage as a steward, to carry on, or execute" or "to manage the affairs of." *Administer*, *Oxford English Dictionary* (2d ed. 1989). The Committee undoubtedly manages the affairs of the Plan. But it does much more than simple administrative functions. As stated, it ensures the existence of the Plan in myriad ways. *See supra* Section I.B.

---

[11] Piggybacking off the *Stapleton* Court's reasoning, Kaplan argues that the "primary ongoing responsibility" includes the ability to be sued and that the Committee has no potential liability here. (Pl.'s Moving Br. 3-4.) The Court expresses no opinion on whether the Committee can be liable. It notes, however, that Kaplan named the Committee as a Defendant here, straining his argument's allure. (*See also* Aug. 10, 2022 Oral Arg. Tr. 12:7-12 (conceding that "the ability for the committee to be sued" is not necessary to determining what "maintain" means and that "the cases are all over the map on whether committees can be sued")).

So viewed, the Committee both administers and maintains the Plan. It administers the Plan by exercising primary oversight over the Plan's health. And it maintains the Plan by ensuring its longevity through routinely meeting and discussing the Plan's investments, recommending necessary amendments to the Plan, setting annual funding for the Plan, and adjudicating claims for the Plan. To this end, the Court finds persuasive the reasoning in *Boden*, in which the court deduced that "nothing in the text of the [church-plan] exemption suggests that the Plan must be exclusively maintained by only one organization." 404 F. Supp. 3d at 1092 (citation omitted). Reviewing the text of the exemption, the court noted that the statutory language "suggest[ed] that more than one organization may 'maintain' a plan":

> The construction of the statute indicates that "maintenance" means more than "administration" or "funding" combined and seems to acknowledge the necessity of both to the viability of a plan. A principal-purpose organization, however, need only perform one of those critical functions—"administration" *or* "funding." As both are obviously necessary to have a successful pension plan, more than one organization could potentially be found to be "maintaining" the plan.

*Id.* (internal citations omitted). In other words, the plain language of the exemption shows that a single organization—the statute connotes "an organization"—may maintain a retirement plan and may also have the "principal purpose or function" of "administration *or* funding." 29 U.S.C. § 1002(33)(C)(i) (emphases added). Congress's choice of the disjunctive suggests that a church may (as here) have one organization responsible for maintaining and administering the plan *and* another for maintaining and funding the plan. The Court thus agrees with *Boden* that Congress did not foreclose a reading of the church-plan exemption that permits multiple entities to maintain a plan or that permits a single entity from maintaining and administering a plan.

Against the plain language of the exemption, Kaplan puts forth no authority showing why the Court must conclude that two entities separately maintain and administer the Plan. He instead focuses on the differences between a plan administrator and a plan sponsor. (Pl.'s Moving Br.

26-31 (relying, *e.g.*, on 29 U.S.C. § 1002(16) that defines "administrator" and "plan sponsor" separately).) Again, the Court agrees that those are distinct concepts. But nothing in the language of the church-plan exemption states that the plan administrator cannot also maintain the plan or that the plan sponsor cannot delegate certain maintenance duties to a plan administrator. *See Medina*, 877 F.3d at 1226-27 (reasoning as "contrary to common sense" and "not the most intuitive" the plaintiff's reading of the statute that "would only allow the exemption for wholly independent bodies, constituted with the principal purpose of administering or funding a retirement plan, and endowed with the power to modify or terminate that plan"). Kaplan's cry of conflation between maintenance and administration is simply a problem of his own making.

To close, the Court notes that the post-*Stapleton* caselaw squarely favors Defendants' interpretation of "maintain." The Court has recounted the three circuits that have all concluded that a corporate committee can maintain a plan. On the other side is a district court case. In *Rollins*, the Northern District of California denied the defendants' motion to dismiss that argued that "plan administration and plain maintenance are essentially the same thing." 338 F. Supp. 3d at 1025. Without relying on dictionaries or other contemporaneous sources to define those terms, the court concluded that "maintain" and "administer" must differ because Congress would not have otherwise included both terms in the church-plan exemption. *See id.* at 1035-36. The Court easily discards any reliance on this case. For one, even the *Rollins* Court recognized how preliminary its ruling was, noting that "the application of the statute to the facts learned in discovery may clarify the statute's meaning"—*even though* "the meaning of a statute is a pure question of law." *Id.* at 1037. And in all events, the *Rollins* Court did not yet have occasion to consider the plain meaning of the terms "maintain" and "administer." The courts that have (often in the summary-judgment

context) concluded as the Court does here. *E.g.*, *Medina*, 877 F.3d at 1224-27; *Boden*, 404 F. Supp. 3d at 1086-92.

### 2.        Organization

The Court also concludes that the Committee is an organization under the church-plan exemption. The exemption requires that the plan be maintained by "an organization, whether a civil law corporation or otherwise." 29 U.S.C. § 1002(33)(C)(i). "Organization" means (among other definitions) "co-ordination of parts or elements in an organic whole" or "systematic arrangement for a definite purpose." *Organization*, *Oxford English Dictionary* (2d ed. 1989); *see also Sanzone*, 954 F.3d at 1044 (detailing similar, albeit more modern, definitions of organization). In addition, Congress provided some guidance as to its thinking about the term "organization," denoting that an organization may be "a civil law corporation *or otherwise*." 29 U.S.C. § 1002(33)(C)(i) (emphasis added). As the Seventh Circuit concluded on reading that provision, the word "otherwise" is "capacious" and "does not require that the organization in question be any particular type of non-corporate legal entity nor, indeed, an entity legally separate from the plan sponsor at all." *Smith*, 933 F.3d at 869. The Court agrees that both Congress and the dictionary imbue the term "organization" with an expansive meaning.

The Committee qualifies as an organization. The bylaws give the Committee a systematic and enduring structure, noting that the Committee "shall" consist of the Chair, the Saint Peter's Chief Financial Officer, the Saint Peter's Vice President for Human Resources, and at most seven additional Saint Peter's board members (or their elected designees). (Bylaws art. V, § 13(a).) The bylaws further vest the Committee with a common and definite purpose: "overall responsibility for the oversight of the retirement plans sponsored by [Saint Peter's]." (*Id.* art. V, § 13(b)(1).) Nor is the Court troubled that an internal committee qualifies as an organization, as Congress already made that choice. By including the statutory term "otherwise"—literally, in other ways—Congress

signified that corporations may delegate the principal-purpose functions to internal committees or other organizations as they see fit. Any other reading of the statute would cabin the capacious meaning of the term.

Nor is the Court concerned by Kaplan's worry that reading "otherwise" broadly means that an organization could be "any possible entity." (Pl.'s Moving Br. 35.) As a matter of common sense, for the church-plan exemption, an organization must bear some relation to the "civil law corporation" and maintenance of a retirement plan. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it." (citations and internal quotation marks omitted)). That's precisely what the Committee is here—an expression of Saint Peter's (the "civil law corporation") delegating certain maintenance and administration functions of the Plan to the Committee ("or otherwise"). The Court need not speculate on the endless possibilities of corporate divisions and potential third-party organizations. For now, the plain meaning and undisputed evidence show that the Committee is an organization.

### C.      The Committee Is Associated with the Roman Catholic Church.

Which brings the Court to the final question under *Medina*, whether the Committee is associated with the Roman Catholic Church. It is. Just like the Tenth Circuit's reasoning in *Medina*, the Court agrees that logically, the Committee must be associated with the Roman Catholic Church as a subpart of Saint Peter's. *See Medina*, 877 F.3d at 1227. To be sure, the undisputed evidence shores up that logic. The Bishop of Metuchen (by designation) has a permanent vote on the Committee and may ultimately veto any action taken by the Committee. (Bylaws art. V, § 1; *id.* art. III, § 2.) The Bishop also appoints the Chair and the board members that serve on the Committee. (Bylaws art. III, § 2.) And the Committee hires investment advisors that "monitor[] compliance with the Socially Responsible Investment Guidelines promulgated by the U.S.

Conference of Catholic Bishops." (Stoldt Decl. ¶ 52; *see also* Bylaws art. V, § 9(b) (noting that another committee of Saint Peter's "select[s] investment managers in accordance with the Catholic Ethical and Religious Directives").)

*      *      *

In sum, after a thorough review of the undisputed evidence and the relevant caselaw, the Court concludes that the Plan qualifies for the church-plan exemption under 29 U.S.C. 1002(33)(C)(i). Saint Peter's is an organization that is closely associated with (if not controlled by) the Roman Catholic Church. The Committee is a principal-purpose organization that both maintains and administers the Plan by (among other functions) sustaining the health of the Plan's investments and annual funding. And the Committee is associated with the Roman Catholic Church as a subpart of Saint Peter's and under the supervision of the Bishop of the Diocese of Metuchen.

## IV.    CONCLUSION

The Court grants Defendants' partial motion for summary judgment and denies Kaplan's motion. The Court expresses no view on Kaplan's constitutional challenge to the church-plan exemption and orders the parties to apprise the Honorable Tonianne J. Bongiovanni, U.S.M.J., of the status of that challenge considering the Court's ruling today. An appropriate order will follow.

_____<br>
MICHAEL A. SHIPP<br>
UNITED STATES DISTRICT JUDGE